STATE OF OKLAHOMA *v.* STATE OF TEXAS, UNITED STATES, INTERVENER.

**IN EQUITY.**

No. 23, Original.  Argued December 14, 15, 1920.—Decided April 11, 1921.

Oklahoma brought this suit against Texas to establish the boundary between the two States where it follows the course of the Red River .from the 100th degree of west longitude to the easterly boundary of Oklahoma, contending that, as fixed by the Treaty of February 22, 1819 (8 Stat. 252), the line followed the south bank of that river and that this was finally and conclusively adjudicated in the case of *United States* v. *Texas*, 162 U. S. 1, wherein the final decree declared, "that the territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and *along the south bank*, both of Red River and of the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude—which territory is sometimes called Greer County—constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and is not within the limits nor under the jurisdiction of that State, but is subject to the exclusive jurisdiction of the United States of America;" the United States, intervening to protect proprietary interests claimed for itself and for Indians in the bed of the river, supported these contentions of Oklahoma; while Texas contended that the boundary was fixed by the treaty at the middle of the main channel of the river, and denied that its precise location, whether there or on the south bank, was determined by the former proceeding, asserting that the issues there respecting the river were confined to the question which of

the two forks was the Red River of the treaty and to the ownership of and jurisdiction over the disputed land lying between them. *Held:* (1) That, since there was jurisdiction over the subject-matter and parties in the former case, and since the parties in the cases were the same or in privity, (Oklahoma having succeeded in part, as to governmental jurisdiction, to the position formerly held by the United States), the decree, in locating the boundary line with respect to the course of Red River and in construing the treaty as placing it along the south bank, was conclusive in this case, if the matter so decided was within the issues then proper to be decided, or was presented and actually determined in the course of deciding those issues. P. 86.

(2) That what was involved and determined in the former suit was to be tested by an examination of the record and proceedings therein, including the pleadings, the evidence submitted, the respective contentions of the parties, and the findings and opinion of the court, there being no occasion for resorting to extrinsic evidence. P. 88.

(3) That the matter of the true location of the boundary between the territory of the United States and Texas where it followed the Red River bordering upon Greer County, and the question whether the boundary followed the middle or the south bank of the River, were within the issues made by the pleadings, recognized by both parties and the court, to be determined according to the true effect and meaning of the Treaty of 1819; that, in elucidation, the treaty, and much historical evidence of the negotiations that led up to it, were introduced, discussed by counsel in argument, and referred to in the opinion of the court; and that the matter was directly determined and made a part of the final decree, and by every applicable test was *res judicata.* P. 92.

(4) That the adjudication not only concluded the parties with respect to that part of the boundary which borders upon what was called Greer County, but settled the construction of the treaty (Art. 3) as to the entire course of the Red River where it marks the boundary between the territory then of the United States and that of the State of Texas. P. 93.

THE case is stated in the opinion, *post* 81. (See *post,* 602.)

*Mr. Assistant Attorney General Garnett,* with whom *Mr. W. W. Dyar* and *Mr. John A. Fain,* Special Assistants to the Attorney General, were on the brief, for the United States, intervener.

*Mr. C. M. Cureton,* Attorney General of the State of Texas, and *Mr. Thomas W. Gregory,* with whom *Mr. W. A. Keeling, Mr. E. F. Smith, Mr. C. W. Taylor, Mr. G. Carroll Todd* and *Mr. R. H. Ward* were on the brief, for defendant:

The Treaty of 1819, construed without the assistance of other public documents or acts, fixes the boundary along the mid-channel of Red River. This is confirmed by the negotiations leading up to the treaty and the construction placed upon it by the United States, Oklahoma and the Republic and State of Texas, as indicated by their legislative, executive and judicial documents and acts.

In so far as the decree in the Greer County case, *United States* v. *Texas,* 162 U. S. 1, referred to the boundary line of the Treaty of 1819 as following the south bank of Red River, it was outside the issues litigated and is not conclusive upon the parties to this cause. The pleadings and opinion in that case show that only two issues were presented for decision, the first being whether the 100th meridian erroneously shown by Melish's Map, or the true meridian, should govern, the second issue being which of the two forks of Red River was, above their point of junction, the Red River described in Art. 3 of the Treaty of 1819.

Texas contended that the Melish Map should control, and that, therefore, the boundary lay far east of the forks of Red River, and that Texas was, therefore, entitled to the land known as Greer County without reference to whether the North or South Fork of Red River was the river of the treaty. In the Greer County case the court discusses this first issue on pages 29 to 42 of the opinion, and deciding against the contention of Texas concludes with the statement that the astronomically correct location of the 100th meridian, and not the erroneous location of that meridian shown by Melish's Map, governs.

The court then immediately adds that, "the real question for solution is whether, as contended by the United States, the line 'following the course of the Rio Roxo *westward* to the degree of longitude 100 west from London' meets the 100th meridian at the point where Prairie Dog Town Fork of Red River crosses that meridian, or whether, as contended by the State, it goes *northwestwardly* up the North Fork of Red River until *that* river crosses the 100th meridian many miles due north of the initial monument established by the United States in 1857."

Conformably with its allegations, the amended bill prayed to have determined "and put at rest questions which now exist as to whether the Prairie Dog Town fork or the North fork of Red River, as aforesaid, constitutes the true boundary line of the Treaty of 1819, aforesaid, and whether the tract or parcel of land lying and being between said two streams, and called by the authorities of the State of Texas 'Greer County,' is within the boundary and jurisdiction of the United States, or of the State of Texas." It is therefore specifically stated that one of the "questions which now exist" is which fork constituted the boundary line of the treaty, and the other question is did the land lying between the two forks belong to the United States or Texas.

The prayer asks to have the "true boundary line" determined and settled, but, in the same sentence, this general request is limited by the specific statement that the issue is "whether the Prairie Dog Town fork or the North fork of Red River, as aforesaid, constitutes the true boundary line of the Treaty of 1819;" the general request to have the true boundary line determined is, therefore, qualified by the more specific prayer that the court determine which of the two forks constitutes the true boundary line.

But, if the prayer is given a broader meaning than that

which is here suggested as correct, it will not warrant a decree going beyond the issue made by the pleadings. No matter how broad the prayer for relief may be the decree must conform to the case stated in the bill. *Allen* v. *Pullman's Palace Car Co.*, 139 U. S. 658, 662; *Kent* v. *Lake Superior Canal Co.*, 144 U. S. 75, 92; *Cates* v. *Allen*, 149 U. S. 451, 459; *Barnes* v. *Chicago, Milwaukee & St. Paul Ry.*, 122 U. S. 1.

The answer of Texas met the issue concerning the two forks and set forth a number of reasons why the court should find that the North Fork was the river of the treaty. Certain acts of the plaintiff alleged to be a recognition of the defendant's claim were pleaded, but none of these acts raises any question concerning the location of the treaty line upon Red River. The answer concludes by asserting that "The Rio Roxo of the Treaty is and was the North Fork of Red river, so called by the complainant, and not the Kecheaquehono or South prong of Red river, as styled by complainant," and that "Greer County hath ever been the territory of Texas and of those to whom Texas is successor," and asked for dismissal of the bill.

The briefs filed in the Greer County case do not, any more than the pleadings, raise any question concerning the location of the treaty line upon Red River. There is, therefore, no evidence that, although the pleadings did not raise this issue, the parties nevertheless presented the question to the court. On the contrary, the briefs show that they did not do so. The lack of such proof and contention are important since the party invoking the doctrine of *res judicata* as to even an essential issue not involved in the pleadings has the burden of establishing that the issue was in fact litigated. *Silberstein* v. *Silberstein*, 218 N. Y. 525, 528.

The opinion in the Greer County case clearly recognizes the nature of the issues presented by the pleadings and

litigated by the parties. It even states the exact acreage, down to a fraction of an acre, contained in Greer County, and says that the land involved is north of the line marked on the map with the words "Boundary claimed by U. S." On turning to the map referred to and appearing on page 22 of the opinion, it will be observed that the "Unassigned Land" is thereon indicated as bounded on the south by a line marked "Boundary claimed by U. S." and that the land in dispute lies north of this line, as stated by the court; also that the line marked "Boundary claimed by U. S." is not on the south side of the river, but is either on the north side of the river or in the middle of the river.

In no part of the lengthy opinion does the court discuss the question whether the boundary line follows the mid-channel or the south bank of Red River. The opinion does not mention the south bank of Red River, but in one place it assumes that the treaty placed Red River within the United States (p. 37).

No reason is given in support of this conclusion. The statement in regard to Red River is, in fact, merely parenthetical, and is beside the point which the court was considering, namely, whether the 100th meridian of the boundary line was that marked upon Melish's Map or was the true 100th meridian.

Not only was there no allegation or contention in the pleadings, or in the briefs or in the opinion, in the Greer County case to the effect that the south bank of Red River was, or was not, the boundary, but it is confidently asserted that the words "south bank," in relation to Red River, do not occur in the entire Greer County record and proceedings except in the decree of the court.

The pleadings in the Greer County case excluded from the court's consideration the question whether or not the boundary line followed the south bank of Red River.

The present suit is to settle the title to the land lying

between the middle of Red River and its south bank; the Greer County case was to determine which fork of Red River was the river of the treaty and thereby settle the title to the land between those forks.

The amended bill sums up the substance of the complaint by stating that the United States by the Treaty of 1819, "Became entitled to possession of and jurisdiction over all that parcel or tract of land which lies between what has been herein designated as the Prairie Dog Town Fork or Main Red River, and the North Fork of Red River." The answer of Texas does not question or deny complainant's above description of the area in controversy. The opinion recognizes that the lands in litigation were bounded by and lay between the two forks of the river. The act of the Texas legislature creating Greer County and fixing the river forks as boundaries was quoted in the opinion, and at another point (p. 88) Justice Harlan refers to the fact that Texas had "created the county of Greer with boundaries that include the whole of the territory in dispute."

The pleadings and opinion show that the land in dispute was throughout defined as bounded, except on the west, by the two forks of Red River.

A river named as a boundary fixes the line in the main channel of the stream unless other clauses are used which extend or restrict the grant. This rule is applied to the construction of private grants. *Brown* v. *Huger*, 21 How. 305, 320; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, 287. It is also the rule applied to treaties or public enactments. Where a navigable river is made the boundary between States the line, in the absence of a contrary stipulation, follows the middle of the main channel, or the *Thalweg*, of the stream. *Handly's Lessee* v. *Anthony*, 5 Wheat. 373, 379; *Iowa* v. *Illinois*, 147 U. S. 1; *Arkansas* v. *Tennessee*, 246 U. S. 158; *Minnesota* v. *Wisconsin*, 252 U. S. 273.

By applying these rules of construction it is seen that

in the Greer County case the territory in controversy was stated to be that lying between the center of the main channel of the North Fork and the center of the main channel of the South Fork of Red River and east of the 100th meridian.

The issue contained in the pleadings was therefore made definite by description of the territory involved in the dispute. This description eliminated from the court's consideration any issue of whether the line fixed by the Treaty of 1819 followed the center of the main channel or the south bank of Red River, for the disputed area did not extend south of the center of the main channel of the South Fork of the river. To decree that the land south of the center of this main channel belonged to the United States was to overstep the limits of the case made by the parties.

The petition of intervention filed by the United States in this cause suggests that the court in the Greer County case, after awarding the land in controversy to the United States, was required to "define and delimit with certainty . . . both southern and the western boundaries." This suggestion is based on the incorrect assumption that the parties had asked the court to define and delimit the boundaries of the disputed territory, whereas in fact the parties had themselves defined this territory and had agreed upon its limits as those of Greer County. Having so agreed, the court was not only not required, but it was not authorized, to enter a decree going beyond those limits.

When a suit is upon a demand different from that involved in a former suit between the same parties or their privies, the decree in the former suit is conclusive only in respect to matters put in issue and litigated in that suit. *Southern Pacific R. R. Co.* v. *United States*, 168 U. S. 1, 48, 49; *Cromwell* v. *County of Sac*, 94 U. S. 351, 356; *Russell* v. *Place*, 94 U. S. 606, 608, 609; *Radford* v. *Myers*, 231 U. S. 725, 733.

The doctrine of *res judicata* rests upon the fact of prior litigation of the same question. Accordingly, when the doctrine is invoked the court is called upon to decide whether the matter alleged to be concluded was or was not in fact litigated in the prior suit. In case of doubt the court determines the scope of the matters previously litigated by interpreting the decree which was entered, in the light of the pleadings and of the opinion of the court. *National Foundry & Pipe Works* v. *Oconto Water Co.*, 183 U. S. 216, 234. If the pleadings and the opinion of the court show that any portions of the prior decree went beyond the issues litigated the court in the subsequent suit limits the binding effect of this decree to the questions which were actually presented to the court for decision. *Graham* v. *Railroad Co.*, 3 Wall. 704; *Barnes* v. *Chicago, Milwaukee & St. Paul Ry.*, 122 U. S. 1; *Vicksburg* v. *Henson*, 231 U. S. 259.

The rule that the binding effect of a decree is limited to the issues either framed by the pleadings or actually litigated is not a mere rule of construction, but is a binding restriction upon the power of the court, rendering void any judgment or any portion of a judgment rendered in violation of the rule. *Reynolds* v. *Stockton*, 140 U. S. 254, 265, 266; *Washington R. R.* v. *Bradleys*, 10 Wall. 299, 303; *Landon* v. *Clark*, 221 Fed. Rep. 841; *Mitchell* v. *Insley*, 33 Kansas, 654. The opinions of text writers and the decisions of state and federal courts unanimously support the rule that a decree or judgment is void in so far as it purports to decide a point not in issue in the case [citing many cases].

No special features in the Greer County case authorized a decree outside the scope of the issues litigated. The principle that "equity will do complete justice" did not extend the scope of the issues. That principle does not in any way blur the difference between matters in issue and those not in issue. It applies only to the

former, but it says that equity is not barred from giving complete relief because part of the relief which it grants might have been given by a court of law. *United States v. Union Pacific Ry. Co.*, 160 U. S. 1, 50. Defendant therefore points out that the principle cannot be applied so as to enlarge or extend the issues made by the parties in the Greer County case.

It should also be noted that in the Greer County case this court was not exercising the usual form of equity jurisdiction, but a jurisdiction based on the exercise of sovereign authority and the maintenance of peace and order within the territory involved. As an ordinary rule courts of equity will not act to ascertain boundaries unless, in addition to confusion over the boundaries, there is some peculiar equity suggested, such as fraud, multiplicity of suits, or such relationship between the parties that it is incumbent upon one of them to preserve the boundaries. Pomeroy's Equitable Remedies, 2nd ed., §§ 694–697.

This court has not treated boundary disputes between States as strictly a part of equity jurisdiction, but has followed what seemed to be the nearest precedents and framed its proceedings according to those adopted by the English Court of Chancery where boundaries of political bodies were brought in question before it; in these boundary disputes between States the court has followed the rules of equity only when they appeared to serve the ends of justice. *Rhode Island* v. *Massachusetts*, 14 Pet. 210, 256–258.

The declarations in the opinion cited are not such as would lead this court to apply to the Greer County case any equitable principle which would so operate as to conclude a sovereign State in respect of a boundary question which was not in issue, which the State never argued and was never called on to argue, and which was never presented to the court, particularly in such a case as the

present, where farms and oil wells and improvements of
enormous value are involved, most of them hundreds of
miles from Greer County and all far removed therefrom.
The court in the earlier case did not have before it
the evidence bearing upon whether the boundary fol-
lowed the mid-channel of Red River or its south bank.

In the present suit the court is called upon to deter-
mine the intention of the parties to the treaty with refer-
ence to the boundary line fixed along Red River, and light
upon their intention is sought from the negotiations lead-
ing up to the treaty and from the practical construction
which the parties have subsequently given to it. The Greer
County record is completely silent upon the latter point.

The negotiations leading up to the treaty must be
analyzed from the standpoint of their bearing upon the
final agreement reached with reference to the course
of the treaty line along Red River if they are to be of any
assistance in deciding the question now being litigated.
No such analysis was called for by the nature of the
issues to be determined in the Greer County case, and
the court's opinion clearly indicates that no such analysis
was made. The court in that case could hardly have been
more enlightened upon the question now in controversy
than it would have been if the proposals and counter
proposals of the parties to the negotiations had not been
presented in evidence.

This court has announced that the doctrine of *res
judicata* must be applied with caution. *Vicksburg* v. *Hen-
son,* 231 U. S. 259.

In construing the decree rendered in the Greer County
case the words "along the south bank," contained therein,
should be eliminated from consideration because their
presence makes contradictory the two descriptions of
the land described in the decree, which in their absence
would otherwise agree. The words "Greer County"
have, all through this controversy and litigation, had a

definite and distinct meaning, being a tract of land with its south line resting in the middle of the main channel of the Prairie Dog Fork or South Fork of Red River, as shown by the field notes of the act of Texas creating Greer County and set out in the opinion of this court in the Greer County decision. When, therefore, the decree in the Greer County case described the land awarded to the United States as the territory "sometimes called Greer County," it thereby described a tract of land different from that described in the prior portion of the decree, in which the line is described as "along the south bank." Therefore, the decree is contradictory and becomes so by virtue of the insertion of the words "along the south bank." It is believed that these words were inserted in the decree through inadvertence, and that they should not be considered in construing the decree.

*Mr. Joseph W. Bailey* and *Mr. A. H. Carrigan,* for the landowners, by special leave of court.

*Mr. S. P. Freeling,* Attorney General of the State of Oklahoma, for complainant.

MR. JUSTICE PITNEY delivered the opinion of the court.

This is a suit in equity in our original jurisdiction, brought by the State of Oklahoma against the State of Texas, to establish the true boundary line between those States where it follows the course of the Red River from the 100th degree of west longitude to the easterly boundary of Oklahoma. The bill avers that by the third article of a treaty concluded February 22, 1819, and ratified and proclaimed February 22, 1821 (8 Stat. 252), between the United States of America and the King of Spain, who had sovereignty over the territory now known as Texas but then a part of Mexico, the boundary line

between the two countries where formed by the Red River was established as following the south bank of that stream; that after Mexico had become independent, and on January 12, 1828, a treaty was concluded, and on April 5, 1832, ratified and proclaimed, between the United States of America and the United Mexican States, by which the validity of the Treaty of 1819 was confirmed (8 Stat. 372); that in the year 1837 Texas was recognized as an independent republic, no longer under the power and jurisdiction of Mexico, and on April 25, 1838, a treaty was concluded, and in the same year ratified and proclaimed, between the United States and the Republic of Texas, by which the boundary as thus established was accepted by that Republic as binding (8 Stat. 511); and that under joint resolutions of Congress dated respectively March 1 and December 29, 1845 (5 Stat. 797; 9 Stat. 108), Texas was admitted into the Union as a State, with "the territory properly included within, and rightfully belonging to the Republic of Texas." That by Act of Congress approved May 2, 1890, a temporary government was provided for a part of the territory adjoining said boundary on the north, now comprised in the State of Oklahoma, under the name of the Territory of Oklahoma (c. 182, 26 Stat. 81), and that by § 29 (p. 93) the remaining part was designated as the Indian Territory; but that by § 25 (p. 92), in view of the existence of a controversy between the United States and the State of Texas as to the ownership of what was known as Greer County, described as "the tract of land lying between the North and South Forks of the Red River where the Indian Territory and the State of Texas adjoin, east of the one hundredth degree of longitude," it was provided that the act should not apply to that county until the title thereto had been adjudicated and determined to be in the United States; and, in order to provide for a speedy and final judicial determination of the controversy, the Attorney General

was authorized and directed to commence in the name and behalf of the United States and prosecute to a final determination a suit in equity in this court against the State of Texas; that accordingly, at the October Term, 1895 (1890), the Attorney General of the United States filed in this court an original bill against the State of Texas to determine whether the territory embraced within the then County of Greer was in the State of Texas or within the territory and exclusive jurisdiction of the United States; that after a full hearing of said cause this court found, decided, and decreed that the territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of a line following westward, as prescribed by the Treaty of 1819, the course, and along the south bank, both of Red River and of the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude, constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and was not within the limits nor under the jurisdiction of that State, but was subject to the exclusive jurisdiction of the United States of America (162 U. S. 1, 90–91); and that afterwards, under Act of Congress approved June 16, 1906, c. 3335, 34 Stat. 267, the inhabitants of the area constituting the Territory of Oklahoma (including said Greer County) and the Indian Territory were admitted into the Union as the State of Oklahoma.

The State of Texas appeared in the present suit and filed an answer denying that the Treaty of 1819 fixed the boundary at the south bank of the Red River; asserting on the contrary that the treaty, by its legal meaning and effect, fixed it in the middle of the main channel of that river; denying that the effect of the decree in the case of *United States* v. *Texas* was to determine that the south

bank of Red River, or of the Prairie Dog Town Fork or South Fork of that river, constituted the boundary between the United States and Texas at any point; and setting up a counterclaim and other matters not necessary to be here repeated.

The United States, by leave of the court, intervened, and by its petition of intervention set up an interest as trustee of Indian allottees with respect to certain portions of the bed of the Red River and as owner in its own right of a large part of the bed and of numerous islands therein; and supported the contentions of the State of Oklahoma as to the location of the boundary line by the true construction of the Treaty of 1819 and as to the effect of the final decree in *United States* v. *Texas.*

At the same time it was brought to the attention of the court that because· of the recent discovery and development of oil and gas deposits in the bed of the river adjacent to Wichita County, Texas, serious conflicts had arisen between parties claiming title from the State of Texas and others claiming title from the State of Oklahoma or under the mineral laws of the United States; and that there was danger of the exhaustion of the deposits of oil and gas pending the determination of the questions at issue between the parties to the cause, and danger of armed conflict between rival claimants under them; and thereupon, on motion of the United States, concurred in by the State of Oklahoma and consented to by the State of Texas as to lands claimed in its proprietary capacity, we appointed a receiver to take possession of that part of the river bed lying between mid-channel and the south bank, and within the disputed oil field.

Pending the receivership, by order of June 7, 1920, made pursuant to the suggestion of the parties, we set the cause down for hearing at the present term upon two questions of law, with leave to take testimony pertinent to the purpose. 253·U. S. 471.

The testimony was taken and returned, a hearing has been had, and the matter is now to be decided.

The questions are as follows: " (1) Is the decree of this court in *United States* v. *The State of Texas*, 162 U. S. 1, final and conclusive upon the parties to this cause in so far as it declares that the Treaty of 1819 between the United States and Spain fixed the boundary along the south bank of Red River? (2) If said decree is not conclusive, then did the Treaty of 1819, construed in the light of pertinent public documents and acts, fix the boundary along the mid-channel of Red River or along the south bank of said river?"

The first is a question of *res judicata*, and, obviously, if it is answered in the affirmative, the second becomes immaterial.

The general principle, applied in numerous decisions of this court, and definitely accepted in *Southern Pacific R. R. Co.* v. *United States*, 168 U. S. 1, 48–49, is, that a question of fact or of law distinctly put in issue and directly determined by a court of competent jurisdiction as a ground of recovery or defense in a suit or action between parties *sui juris* is conclusively settled by the final judgment or decree therein so that it cannot be further litigated in a subsequent suit between the same parties or their privies, whether the second suit be for the same or a different cause of action. As was declared by Mr. Justice Harlan, speaking for the court in the case cited (p. 49): "This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of

all matters properly put in issue and actually determined by them."

In order to aid us in ascertaining whether the question of boundary location now at issue was settled by the decision and decree in the Greer County case, the parties have stipulated that the entire record in that case, including pleadings, stipulations, testimony, briefs, and documents of every character, now on file in this court, and the orders and decrees of the court therein, are to be considered in evidence for all purposes. They have been examined and considered accordingly.

The jurisdiction of the court over the subject-matter of that suit—its original jurisdiction over a suit in equity brought by the United States against one of the States to determine the boundary between such State and a Territory of the United States—was put at issue by a demurrer to the bill of complaint in that case, and decided in favor of the jurisdiction. *United States* v. *Texas*, 143 U. S. 621, 641, *et seq.* It was set at rest when followed by the making of a final decree. *United States* v. *Texas*, 162 U. S. 1, 90–91.

That the court had jurisdiction over the parties is obvious from the fact that the suit was brought in behalf of the United States pursuant to an act of Congress (Act of May 2, 1890, c. 182, § 25, 26 Stat. 81, 92), that a bill of complaint and an amended bill were filed, to each of which the State of Texas demurred, and also answered; and that the United States filed a replication (162 U. S. 21–23), and both parties introduced evidence and participated in the hearing.

There is identity of parties between the former suit and the present one, so far as concerns the proprietary interest now set up by the United States. As to governmental jurisdiction, the State of Oklahoma has succeeded in part to the position formerly held by the United States, and therefore is in privity with it.

The former decision was based upon final hearing, on issue joined between the parties and upon evidence taken by both; and, as stated, it resulted in a final decree (162 U. S. 90–91).

Therefore it remains only to consider whether the "right, question, or fact" now in controversy—the location of the boundary line with respect to the course of the Red River, and whether by the true construction of the Treaty of 1819 its location is along the south bank or in mid-channel—was put in issue and directly determined in the former case. That the final decree purports to determine it, is obvious from a reading of the language employed (162 U. S. 90): "That the territory east of the 100th meridian of longitude, west and south of the river now known as the North Fork of Red River, and north of *a line following westward, as prescribed by the treaty of 1819 between the United States and Spain, the course, and along the south bank, both of Red River and of the river now known as the Prairie Dog Town Fork or South Fork of Red River until such line meets the 100th meridian of longitude*—which territory is sometimes called Greer County—constitutes no part of the territory properly included within or rightfully belonging to Texas at the time of the admission of that State into the Union, and is not within the limits nor under the jurisdiction of that State, but is subject to the exclusive jurisdiction of the United States of America."

The literal meaning of this is not seriously disputed; but it is insisted that, so far as it describes the boundary line of the treaty as following the south bank of the river, it was outside the issues litigated, and hence is not conclusive upon the parties to this cause—in effect, that in construing the decree the words "along the south bank" should be excluded from consideration. Clearly, the inclusion of those words amounted to a decision that the correctness of that particular definition of the boundary

was within the issues in the cause. But we concede that, in a subsequent suit upon a different cause of action, the question whether the matter decided on the former occasion was within the issues then proper to be decided, or was presented and actually determined in the course of deciding those issues, is open to inquiry, and that, unless it be answered in the affirmative, the matter is not *res judicata*.

What was involved and determined in the former suit is to be tested by an examination of the record and proceedings therein, including the pleadings, the evidence submitted, the respective contentions of the parties, and the findings and opinion of the court; there being no suggestion that this is a proper case for resorting to extrinsic evidence. *Russell* v. *Place*, 94 U. S. 606, 608; *Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 688, *et seq.; Baker* v. *Cummings*, 181 U. S. 117, 124–130; *National Foundry & Pipe Works* v. *Oconto Water Supply Co.*, 183 U. S. 216, 234.

The Act of May 2, 1890, c. 182, 26 Stat. 81, 92, briefly recited the existence of a controversy between the United States and the State of Texas as to the ownership of the land known as Greer County, and directed the Attorney General to bring suit in this court in order that the rightful title to that land might be finally determined. Referring to this, and to the history and nature of the controversy, it is contended that the pleadings should be so construed as to confine the issue to the identification of one of the forks of the Red River with the Red River of the treaty. It is true that the principal matter in dispute was the claim of the United States to ownership of the tract of land lying between the forks and bounded on the west by the 100th meridian. But the bill and the amended bill, after reciting Article 3 of the treaty defining the boundary line between the United States and Spain, by which both parties to the cause were bound, and recount-

ing the history of the controversy, concluded with a prayer that the bill might be filed and Texas made a defendant thereto, "to the end and for the purpose of *determining and settling the true boundary line* between the United States and the State of Texas, and to determine and put at rest questions which now exist as to whether the Prairie Dog Town Fork or the North Fork of Red River, as aforesaid, constitutes the true boundary line of the Treaty of 1819"; and that upon final hearing a decree might be entered establishing complainant's rights as set up in the bill; and there was a prayer for general relief. The contention now made is based upon an unduly narrow interpretation of the act and of the pleading. Granting that the substantial controversy related to the ownership of and jurisdiction over the tract lying between the forks, it was essential to a complete and precise disposition of that controversy that the court should define with certainty the bounds of the tract. If it were to be awarded to the State of Texas, an accurate definition of its northerly boundary was essential; if to the United States, like accuracy in defining its southerly boundary was called for; in either case, the line to be defined was "the true boundary line between the United States and the State of Texas." And if, as suggested, the river is to be regarded as navigable (upon which we express no opinion), so that a boundary line separating national territory from that of the State, if described as following the river, without more, would by implication follow the middle of the main navigable channel, as in a case between adjoining States (*Iowa* v. *Illinois*, 147 U. S. 1, 13; *Arkansas* v. *Tennessee*, 246 U. S. 158, 171), so much the more was specific mention of the bank essential to an accurate description of the tract in issue, if the bank was the true line instead of mid-channel. And if at the termination of the suit the line were left undefined, a ground of further controversy would remain; and it is as foreign to correct

practice as to the principles of equity that a final decree should be pregnant with further litigation.

Even less substantial is the suggestion that the language of § 25 of the Act of 1890 (26 Stat. 92) authorizing suit to determine the title to the tract *"lying between* the North and South Forks of the Red River," etc., and the use of that phrase in the amended bill, had the effect of excluding from the issue land south of the middle of the south fork. Upon so narrow an interpretation, the controversy might as well be confined to the upland between the forks, leaving the United States without claim to any part of the bed of the stream, if the south fork proved to be the river of the treaty. Of course, the phrase merely pointed out the tract in dispute, without attempting to delimit it.

The contention that the evidence and the arguments in the Greer County case raised no controversy as to whether the boundary followed the mid-channel or the south bank of the river is not well founded. The Treaty of 1819, and a mass of historical and other data bearing upon its proper interpretation, were before the court. It appeared that the treaty was negotiated at Washington between the Spanish Minister, Don Luis de Onis, and the United States Secretary of State, John Quincy Adams; M. de Neuville, the French Minister, acting at times as an intermediary. The State of Texas itself introduced authenticated extracts from the instructions of the Spanish Minister, and excerpts from correspondence between him and Mr. Adams, from which latter it appeared that the question whether the boundary should follow the middle of the Sabine and Red Rivers, or the westerly bank of the former and the southerly bank of the latter, was one of the points under discussion; the Spanish Minister proposing the middle lines, Mr. Adams the banks.

Furthermore, in the principal brief for the State of Texas, reference was made to entries in Mr. Adams' diary, found in his Memoirs, vol. 4, pp. 233–280, in con-

nection with which the brief declared: "An objection was long persisted in by Spain that instead of the banks of the rivers named being boundaries the middle of the river should be the dividing line (Adams, *sup.*). This objection was at last abandoned," etc. The diary itself, in the pages thus referred to, abounds in statements to the effect that the representative of Spain, during the course of the negotiation, insisted that the middle of the rivers should be taken for the boundary, Mr. Adams firmly insisting upon "the western and southern banks," and at last prevailing. J. Q. Adams' Memoirs, vol. 4, pp. 255, 256, 261, 264, 266, 267, 270. It is true these references were made by counsel for Texas principally with the object of showing the important part that the Melish Map (mentioned in the treaty) played in the negotiations; but it is impossible to escape the conclusion that both counsel and the court understood that the question whether the boundary line, where it followed the Sabine and Red Rivers, should be so located as to establish the United States as owner of the rivers or so as to divide the ownership between the United States and Spain, figured to an important extent in the negotiations, was disposed of by the treaty, and hence was vital to the correct location of the boundary line as between the litigants. If the point was not controverted, it was only because counsel for Texas in effect conceded that the treaty line ran along the south bank of the Red River. It may have seemed, at that time, a matter of no great moment.

Finally, the precise matter was discussed in the opinion of the court, and was made the subject of a finding which was carried into the final decree. In the course of an outline of the diplomatic correspondence and negotiations that preceded the making of the treaty, the court said (p. 27): "The Spanish minister required that 'the boundary between the two countries shall be the middle of the rivers, and that the navigation of the said rivers

shall be common to both countries.' Mr. Adams replied that the United States had always intended that 'the property of the river should belong to them,' and he insisted on that point 'as an essential condition, as the means of avoiding all collision, and as a principle adopted henceforth by the United States in its treaties with its neighbors.' He agreed, however, 'that the navigation of the said rivers to the sea shall be common to both people.'" Citing Annals of Congress, Appendix, 15th Cong., 2d sess., 2120, 2121, 2123. The opinion then proceeded to set forth (pp. 27–29) the third and fourth articles of the treaty, in the former of which occurs the language that Mr. Adams had insisted upon as carrying out the purposes of the United States that "the property of the river should belong to them"; and at a later point the opinion declared (p. 37): "The two governments certainly intended that the line should be run from the Gulf along the western bank of the Sabine River, and after it reached Red River that it should follow the course of that river, leaving both rivers within the United States."

And, having decided the case in favor of the United States, the court embodied in the final decree a description of the boundary line, in terms quoted above.

To sum it up, we find that the question of the true location of the boundary between the territory of the United States and Texas where it followed the Red River bordering upon Greer County, and the question whether the boundary followed the middle or the south bank of the river, were within the issues made by the pleadings, and so recognized by both parties, as well as by the court; that, by the concession of both, the location was to be determined according to the true effect and meaning of the Treaty of 1819; that in elucidation of the matter the treaty, and much historical evidence of the negotiations that led up to it, were introduced, discussed by counsel in argument, and referred to in the opinion of the court;

and that the point was directly determined by the court and the determination made a part of its final decree. By every test that properly can be applied, the matter is *res judicata.*

And, of course, it not only concludes the parties with respect to that part of the boundary which borders upon what was called Greer County, but settles the construction of Article 3 of the Treaty of 1819 as to the entire course of the Red River where it marks the boundary between the territory then owned by the United States and that of the State of Texas.

Having reached this conclusion upon the first of the two questions proposed for decision, it is unnecessary to consider the second, which is whether the treaty, by proper construction, fixes the boundary along the mid-channel or the south bank. The matter being *res judicata,* as the result of the decree in the former suit, it is of no consequence whether it was correctly decided or not. We say this without intending to intimate the least doubt about the propriety of that decision.

The parties may submit within thirty days a proper form of decree for carrying this decision into effect.

*It is so ordered.*

MR. JUSTICE CLARKE took no part in the consideration or decision of this case.