**Louis A. EHRLICH, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 16712.**

United States Court of Appeals
Fifth Circuit.

Feb. 13, 1958.

Wm. P. Congdon, Augusta, Ga., Congdon & Leonard, Augusta, Ga., of counsel, for appellant.

William C. Calhoun, U. S. Atty., William T. Morton, Asst. U. S. Atty., Augusta, Ga., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This action is an outgrowth of the provision in the Lanham Act giving veterans priority and a preferential price in purchasing homes from the Public Housing Administration.[1] Veterans may buy housing units at the construction cost to the government; other purchasers pay the actual market price.

The United States brought suit in the District Court for the Southern District of Georgia to cancel, on the ground of fraud, certain deeds from the Public Housing Administration to six veterans, and also to cancel deeds from each of the veterans to Louis Ehrlich. Ehrlich, who is not a veteran, is accused of using the other six defendants in a fraudulent scheme to purchase for himself certain housing units in a subdivision known as Oglethorpe Homes in Augusta, Georgia.

## I.

Appellant contends that the United States District Court has no jurisdiction to hear the suit, under an express provision of the Lanham Act, 42 U.S.C.A. § 1522:

"* * * any proceedings for the recovery of possession of any property * * * under this subchapter shall be brought by the Administrator in the courts of the States having jurisdiction of such causes and the laws of the States shall be applicable thereto * *."

This provision of the Lanham Act was intended to apply to eviction proceedings, in order to avoid the inconvenience of tenants having to travel to distant federal courts.[2] It has no application to this suit for cancellation of title.

## II.

Two of the defendants, Robert Hambrick and John Wren, filed answers denying that they had any connection with

---

1. "That whenever the Administrator disposes of any permanent house or structure * * * under authority of this subchapter by offering such house * * for sale on an individual basis, he shall, when the purchaser is a veteran buying for his own occupancy, sell any such house or structure (1) at a purchase price not in excess of the apportioned cost of such house or structure and of the land and appurtenances allocated thereto, together with the apportioned share of the cost of all utilities and other facilities provided for and common to the project of which such house or structure is a part, or (2) at a purchase price not in excess of such considered full market value of such house * * * whichever purchase price is the less." 42 U.S.C.A. § 1524.

2. "* * * The provision of the Lanham Act referred to was inserted, as the legislative history shows, so as to require eviction proceedings to be brought in the state courts and thus save tenants, whose ouster should be sought, from the necessity of attendance upon federal courts which might be distant from their homes. * * * There was no need for eviction proceedings in the pending controversy for there were no buildings and no tenants on the land when the suit was brought. It should also be noticed that the present suit was brought by the United States and not by the Administrator and that it is only with regard to suits brought by him to recover possession of property developed under the Housing Act that exclusive jurisdiction is given to the state courts." Gibbs v. United States, 4 Cir., 1945, 150 F.2d 504, 507.

any fraudulent scheme. A third defendant, Sergeant S. C. Lindsey, testified that he thought that the Legal Officer of Harmon Air Force Base in Newfoundland had filed an answer for him, denying his participation in any fraud. A fourth defendant, George A. Buck did not file an answer, but he testified at the trial. The testimony of these four defendants was in substantial agreement: each said that he wanted to purchase for himself the home he was then occupying; each said that he could not finance the down payment of ten per cent the Public Housing Administration required; each said that title was placed in Ehrlich's name simply as part of a bona fide financing arrangement with Ehrlich. Their wives corroborated their testimony.

The other defendants, Robert Jarvis and Raymond Eades are apples off another tree. They testified that they had no intention of buying homes for themselves. At a price, they served as straw men for Ehrlich for whom the properties were really purchased. The price, to Ehrlich, turned out to be heavier than he bargained for. Ehrlich was indicted, convicted on two counts under Section 1001 of Title 18 U.S.C.A., and sentenced to five years probation conditioned on payment of a $10,000. fine. This Court upheld the conviction. Ehrlich v. United States, 5 Cir., 1956, 238 F.2d 481.

In the proceedings below the District Court, without a jury, found that Ehrlich fraudulently and illegally acquired for himself title to the properties occupied by the six other defendants. The Court held that the United States is entitled to recover all of the properties without making restitution of the purchase price and that Louis Ehrlich should be directed to pay to the United States the total gross amount of rent he received from the property.

■ We have studied the record very carefully. The evidence clearly supports the trial judge's findings as to Jarvis and Eades, who were the principal witnesses in the criminal case against Ehrlich. On the other hand, it seems to a majority of the panel that the evidence does not support the trial judge's findings of fraud in the transactions involving the other veterans. As to their conveyances, the judgment of the district court was clearly erroneous.

It has been four years since the transfer of title. Wren, Hambrick, Lindsey, and Buck still occupy their homes. And they still oppose the government taking their homes from them. Ehrlich's character may be forever tainted by his criminal conviction arising out of the Jarvis and Eades transactions. Jarvis and Eades may be tainted. But the taint from Jarvis and Eades does not just rub off on Wren, Hambrick, Lindsey, and Buck because they were all veterans living in Oglethorpe Homes who had contracts with Ehrlich. There may be collateral estoppel as to the Jarvis and Eades transactions. State of Oklahoma v. State of Texas, 1921, 256 U.S. 70, 41 S.Ct. 420, 65 L.Ed. 831; Emich Motors Corp. v. General Motors Acceptance Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534; Local 167 etc. v. United States, 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804. There is no collateral estoppel as to the other transactions; and there is only surmise and suspicion to support the finding as to these other transactions.

Wren swore on the stand that he intended to keep the property as his home and that his agreement with Ehrlich was only a financing agreement. He stated that he went to the Veterans Administration, to banks, to loan companies, and to "numerous other places and they all said they could not give me a loan on the house". Wren said that he "checked with Mr. Pitt to see if it was all right" to buy and transfer to Ehrlich, and Mr. Pitt said that "there was nothing wrong with it". Mr. Pitt was in charge of the sale for the Public Housing Administration. The Wrens have painted their house, "fixed it up on the inside and put in a new heater", "to make it a little nicer to live in * * * as a home."

Hambrick testified that he "had a fellow that was going to finance it" but the

man backed out and left him "in the middle of no place". Then he met Ehrlich at Wren's house and that Ehrlich agreed to "remodel the house, get it reappraised for us, and sell it to us on a G.I. loan or a F.H.A.". He regarded transfer of title to Ehrlich as a mortgage. Mrs. Hambrick testified: "Gracious, yes. [We have made improvements] * * * enlarged the kitchen, put an electric hot water heater in, put tile in the bathroom and the kitchen * * * painted inside and put a fence around it." The Hambricks, like the Wrens, expect to make the place their home indefinitely.

Lindsey testified that he tried to get a G.I. loan, tried a bank, tried the Metropolitan Life Insurance Company, but could not get a loan from these sources because of the condition of the property. "I wanted to keep it as a home * * * for my wife and children. My wife had been sick since 1949 and it was convenient to the hospital." He intends to keep on living there. Sergeant Lindsey knew that he was to convey *title* to Ehrlich: "He couldn't offer to finance it for me without some security." He did not understand that he was "to convey the *property*" to Ehrlich.

Buck testified that he "didn't have any way of purchasing the house at that time and I didn't know exactly what I was going to do. I had three children at that time, a baby just born." He approached Ehrlich who told him that "he'd help me buy the house".[3] Buck said:

"Yes, sir. I mean to stay there just as long as possible. I am making it my home and I have got three children and I hope to make it their home."

There is no doubt that the government has proved that, as to Jarvis and Eades, Ehrlich had a fraudulent scheme in which these two veterans were straw purchasers. There is no doubt that Ehrlich approached other veterans living in Oglethorpe Homes, with the idea of conniving with them to take advantage fraudulently of the veteran's preference. But each transaction must be considered separately.

So far as the Wren, Hambrick, Lindsey, and Buck transactions are concerned, the government's case seems to rest on inferences drawn from the agreement Ehrlich entered into with the veterans. The agreement provided that Ehrlich would put up the money for the veteran to pay in cash for the house he was occupying; the veteran would then convey to Ehrlich who would give the veteran a lease on the property for seven months at the same rental the veteran was paying for the house. At the end of seven months, the veteran had an option for sixty days to repurchase in cash for a period of sixty days at a fixed amount, if no repairs or improvements had been made; if the property had been repaired or improved, the cost would be added to the base price. The government infers that the agreement was a mere sham: if the veteran could not

---

3. "A. Yes, sir. Mr. Ehrlich told me that he would help me buy the house, let me have the money to purchase the house, with an agreement that we carry it for seven months, with an option of two months at the end of the seven months, and during that seven months I was to pay the same rent, the payments that I was paying at that time to the government, and at the end of the seven months I had a two months' option to buy the house back from Mr. Ehrlich. That was the agreement that he and I made.

"Q. Was there any agreement about whether he was going to attend to the financing for you if you decided to buy it back from him? A. Yes, sir. It was in the agreement that he would handle all of the financing of it at the end of the seven months period, if I decided to buy the house.

"Q. Yes, sir. Was there any agreement about remodeling house, or fixing it up in any way? A. Yes, sir. If I desired to have the house remodeled after the seven months period, if I desired to have the house remodeled, Mr. Ehrlich would remodel the house for me, and that would be taken care of by him, that is, the financing and remodeling of the house."

raise the money to take advantage of his preference to purchase at a price below the market value, he could not, seven to nine months later, pay a sum "far in excess" of the preferential price to veterans. The cunning scheme, says the government, in effect, was predicated on the knowledge that the veteran would never be able to exercise his option. This inference, however, is rebutted in great part by the understanding Ehrlich had with the veterans to renovate and improve the property. (Splinterville Village was a colloquialism for Oglethorpe Homes because of the poor condition of the property.) After renovation of the homes by Ehrlich, or through Ehrlich, the veteran would then be eligible for a G.I. loan, or F.H.A. loan, or perhaps even for a conventional loan. The government's surmise is also rebutted by the direct testimony of the four veterans and their wives.

Accordingly, we reverse the judgment below as to Wren, Hambrick, Lindsey, and Buck, and hold that the conveyances to them and their conveyances to Ehrlich should not be annulled as fraudulent.

### III.

 This is a suit in equity to rescind a sale on the ground of fraud. The general rule governing such cases is that he who seeks equity must do equity; that one cannot rescind a sale, even for fraud, without first making restitution of the purchase price. Thackrah v. Haas, 1886, 119 U.S. 499, 7 S.Ct. 311, 30 L.Ed. 486; Grymes v. Sanders, 1876, 93 U.S. 55, 23 L.Ed. 798; Neblett v. Macfarland, 1875, 92 U.S. 101, 23 L.Ed. 471.

The party seeking rescission must undertake to perform whatever conditions the Court may decide to be equitable, if it eventually declares the right of rescission. Twin Lakes Land & Water Co. v. Dohner, 6 Cir., 1917, 242 F. 399, 402. The object, of course, of an equitable suit for rescission is to restore the status quo, not to punish a transgressor. The harm should be undone but there is no reason to reward the victim. Bottemiller v. Ball, 1929, 130 Or. 255, 279 P. 542, 69 A.L.R. 951.

The government contends that there is an exception to these principles in favor of the United States government, citing Pan-American Petroleum & Transport Co. v. United States, 1927, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734; United States v. Trinidad Coal Co., 1890, 137 U.S. 160, 11 S.Ct. 57, 34 L.Ed. 640; and American Jurisprudence.[4] See also Restatement, Contracts (1932) Vol. 2, Sec. 480(1).[5]

We cannot agree that the government of the United States is subject to a lower standard of equity than private individuals. We cannot agree that the government of the United States may be unjustly enriched; private individuals may not.

The cases relied on by the government are distinguishable on the facts and on principle. In United States v. Trinidad Coal Co. certain individuals bought coal lands from the government and then conveyed the land to a corporation, in violation of a statute limiting the land an association could purchase. The Court held that the United States could rescind

---

4. "The United States government, where it rescinds a contract for cause of fraud, need not restore the status quo in the judicial proceedings as a condition to obtaining equitable relief, if the fraud is of such a nature as to frustrate the purpose of the laws or to thwart public policy. In such a case the purpose of the proceedings is to vindicate the policy of the Government, and no equity arises in favor of the wrongdoer to prevent granting the relief sought by the United States. If recourse is to be had by the perpetrator of the fraud in such a case,

it must come from an act of congress." 24 Amer.Juris. Section 196, p. 18.

5. "(1) The power of any party, other than the United States or of one of them, to avoid a transaction for fraud or misrepresentation is conditional on an offer made promptly after acquiring knowledge of the fraud or misrepresentation to return the amount of any money or other performance received as part of the transaction, in substantially as good condition as when received by him, except as stated in Subsection (2) and in §. 481."

the sale without refunding the purchase price. The Court said [137 U.S. 160, 11 S.Ct. 61]:

> "It is contended * * * that the government asking equity must do equity * * *. The rule referred to should not be enforced in a case like the present one. In the matter of disposing of the vacant coal lands of the United States, the government should not be regarded as occupying the attitude of a mere seller of real estate for its market value * * * in making regulations for disposing of them, Congress took no thought of their pecuniary value, but, in the discharge of a high public duty, and in the interest of the whole country, sought to develop the material resources of the United States by opening its vacant coal lands * * * at prices below their actual value. The controlling object of this and similar suits is to enforce a public statute against those who have violated its provisions * * * the defendant is a wrong-doer against whom the government seeks to vindicate its policy * * *."

Pan-American Petroleum & Transport Co. v. United States arose out of the Teapot Dome scandal. The Court held that the government did not have to make restitution in order to secure cancellation of fraudulent leases and contracts, since the agreements tend to defeat the policy of the United States to conserve petroleum reserves needed for national defense. Implicit in both cases is the rationale that the proceedings were not just to recover title but to vindicate, by punitive action, a broad national policy.[6] In one case the policy was to develop coal lands and in the other case the policy was to preserve oil reserves. In addition, in the Pan American case there was the question whether the government should have to pay for improvements it did not want and had no use for.

In these two cases and in the patent cases [7] the land recovered by the government had been part of the public domain, held by the United States in its sovereign right, and disposed of as part of a national development program in which the money received for the land was of little or no consequence compared with the other elements of the program.

In disposing of property under the Lanham Act, however, although veterans receive a preference, the government comes very close to occupying the position of an ordinary individual interested in selling real estate for its market value. There is no prohibition against selling to non-veterans, and they must pay the market value. Even veterans must pay a price equal to the costs of construction. Sales under the Lanham Act are business transactions; sales of the public domain are not business transactions but the machinery for opening up unsettled lands for settlement and development.

Restoration of the status quo in this case would not frustrate the laws of the United States or thwart public policy,

6. "And, while the perpetrator of the fraud has no standing to rescind, he is not regarded as an outlaw; and, if the transaction is rescinded by one who has the right to do so, 'the courts will endeavor to do substantial justice so far as is consistent with adherence to law.' Stoffela v. Nugent, 217 U.S. 499, 501, 30 S.Ct. 600, 601, 54 L.Ed. 856. The general principles of equity are applicable in a suit by the United States to secure the cancellation of a conveyance or the rescission of a contract. United States v. Detroit Lumber Co., 200 U.S. 321, 339, 26 S.Ct. 282, 50 L.Ed. 499; United States v. Stinson, 197 U.S. 200, 204, 25 S.Ct. 426, 49 L.Ed. 724; State of Iowa v. Carr, 8 Cir., 191 F. 257, 266; cf. Mason v. United States, 260 U.S. 545, 557, et seq., 43 S.Ct. 200, 67 L.Ed. 396. But they will not be applied to frustrate the purpose of its laws or to thwart public policy." Pan American Petroleum & Transport Co. v. United States, 273 U.S. 456, 505, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734.

7. See Causey v. United States, 1915, 240 U.S. 399, 36 S.Ct. 365, 60 L.Ed. 711 and Heckman v. United States, 1911, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820.

because the national policy behind the Lanham Act has been asserted effectively through the successful criminal prosecution of Ehrlich.[8] He has been punished once, by public trial and conviction, imposition of a sentence and a fine. Here, to allow the government to keep the purchase price would amount to a second punishment when the wrongdoer has paid his debt to society. The forfeiture of the property to the government in this case distills an essence difficult to identify precisely but one that is offensive to Anglo-American law. It suggests strongly the odor of attainder or of forfeiture of goods and chattels by corruption of blood.

As to the Jarvis and Eades transactions: (1) the transfers to them and their transfers to Ehrlich should be rescinded, conditioned upon the United States making provision for restitution of the purchase price; (2) Ehrlich should not recover for any improvements; (3) Ehrlich should be liable for rents less interest on the moneys paid by him to the United States.

The views expressed in this section of the opinion, relative to the Jarvis and Eades transactions, are mine only. We all agree that the deeds to Jarvis and Eades and the deeds from them to Ehrlich should be rescinded, but Judges Hutcheson and Tuttle are of the opinion that the rescission should not be conditioned upon the United States making provision for restitution of the purchase price. We all agree that Louis Ehrlich should render an accounting for the Jarvis and Eades properties.

The judgment is affirmed in part, and reversed in part.

### Judgment

It is now here ordered and adjudged by this Court that the judgment of the said District Court in this cause be, and the same is hereby, affirmed in part and reversed in part, in accordance with the opinion of this Court, as follows: (1) The judgment of the District Court as to the Wren, Lindsey, Hambrick and Buck deeds is reversed. The several deeds from the United States, acting through the Public Housing Administration, to defendants, Wren, Lindsey, Hambrick, and Buck, and their several deeds to the defendant Ehrlich shall not be annulled and cancelled. (2) The judgment of the District Court as to the Jarvis and Eades deeds is affirmed. The several deeds from the United States, acting through the Public Housing Administration, to the defendants, Jarvis and Eades, and their several deeds to the defendant Ehrlich are hereby annulled and cancelled without restitution of the purchase price, and the said defendant Ehrlich shall execute such deeds and render such accounting as is set forth more particularly in the judgment of the District Court.

HUTCHESON, Chief Judge.

I concur in much of what is said and all that is held in the opinion except the holding on the last page that the rescission of the transfers to Jarvis and Eades is "conditioned upon the United States making provision for restitution of the purchase price."

I disagree with this holding not because I disagree with it in principle and think that this ought not to be the law, but because I think, that it is not a correct statement of the law under the decided cases, and that I am constrained thereby to disagree with it.

TUTTLE, Circuit Judge (dissenting in part).

I respectfully dissent. It seems clear to me that no appellate court could legally hold that this judgment was not so factually supported as to withstand the clearly erroneous test. On the face of the written documents themselves the Government proved a prima facie case, since they showed that each veteran had signed a deed to Ehrlich prior to his own acquisition of the property from the Government.

As to the legal point respecting the duty of the Government to offer restitution, I think this Court is bound by the cited decision of the Supreme Court. The harshness of the rule, which is not of our making, does not, it seems to me, warrant our not following it.

---

8. "It is interesting to note that it has been said that the general rule requiring restoration to a defendant is applicable to the United States, although the rule will not be applied to frustrate the purpose of its laws or thwart public policy." 9 Amer.Juris. § 39 p. 385 *citing as authority the Pan American case.*