**John F. O'NEILL, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 17013.**

United States District Court
E. D. New York.

Oct. 10, 1961.

See also 172 F.Supp. 904.

Albert Podrid, New York City, by Albert B. Lewis, New York City, of counsel, for plaintiff.

Joseph P. Hoey, U. S. Atty., Brooklyn, N. Y., by Lee Phillips and Leonard Goldberg, Attorneys, Tax Division, Washington, D. C., for defendant.

RAYFIEL, District Judge.

This is an action, under Section 1346 (a) (1), of Title 28 United States Code, to recover the sum of $751.23 which the plaintiff claims the District Director of Internal Revenue, Brooklyn, New York, has illegally, erroneously and excessively collected from him for excise taxes on wagering, and for abatement of an allegedly illegal, arbitrary and excessive assessment for excise taxes on wagering levied against him by the said District Director.

In its answer the Government admitted that the sum in question was collected from the plaintiff, denied that it was illegal, erroneous or excessive, and interposed a counterclaim seeking judgment against the plaintiff for the sum of $64,-598.40, representing excise taxes on wagering and penalties for the period from November 1, 1951 through February 26, 1953.

The wagering taxes collected from and/or assessed against the plaintiff resulted from a raid made by the Nassau County, New York, Police Department on premises located at 59 Front Street, Rockville Centre, Nassau County, Long

Island, on February 26, 1953. During the course of this raid the police found two telephones, a radio, a clock, racing forms and numerous slips of paper on which were markings identified at the trial before me as betting slips. These related to bets made in December, 1952 and January and February 1953, and were received in evidence as Government's Exhibit "J". Among those slips was one in the plaintiff's handwriting, giving instructions concerning a bettor who was a customer of one Davis. Another exhibit in the plaintiff's handwriting seized at the time of the raid was Government's Exhibit "O", which, according to a Government expert, Special Agent Wilson, was a slip outlining the method of the pay-off of bets.

The plaintiff offered only his own testimony. He told an incredible story. He denied that he was a bookmaker or was engaged in the business of accepting wagers. He admitted, however, that he took bets, made pay-offs, gave certain instructions as to the matters referred to in the aforementioned slips in his handwriting, and looked for and rented locations suitable for bookmaking operations. All of these latter activities, he testified, were engaged in by him, not in his own behalf, but as an accommodation for one Joe Byrd, who was a good customer at a tavern and restaurant in Astoria, New York, which he owned, and whose patronage he was anxious to retain. He persisted in this story despite the introduction in evidence (Government's Exhibit A) of a photostatic certified copy of an information filed on November 7, 1955 in this Court, to which the plaintiff pleaded guilty on January 19, 1956, an information charging him with engaging in the business of accepting wagers in Nassau and Suffolk Counties from December 1, 1952 through February, 1953, and with unlawfully, wilfully and knowingly failing "to pay the special tax imposed under Section 3290 of the Internal Revenue Code to the Director of Internal Revenue for the First Internal Revenue Collection District of New York at Brooklyn, New York.

"In violation of Sections 2707(b), 3290, 3291(a), 3294(a) (c), Title 26, United States Code."

A certified copy of the commitment attached to this exhibit disclosed that the plaintiff herein (the defendant therein) was fined the sum of $2,500 for this offense.

During the course of the Government's case three witnesses, Henry D. Reinke, John Hummel and Edward Odess, testified that they placed wagers with the plaintiff in the period in question, that he collected from them when they lost, and paid them when they won.

The assessment of $64,702.58 made by the Government on October 28, 1953 for wagering taxes and penalties was computed as follows: The Government agents listed the slips for the month of February, 1953 seized in the raid and tabulated them. Although approximately 149 slips were seized for that month the agents used only 108 in making their computation. The total of *all* of the February, 1953 slips was $23,400, but those used in the computation aggregated only $17,944. No explanation was offered for the use of the smaller figure. The figure for the month of February was taken as most representative, since it covered the latest month. The 10% excise tax, pursuant to Section 3285 of the Internal Revenue Code of 1939, as added by Section 471 of the Revenue Act of 1951 (26 U.S. C.1952 Ed., Sec. 3285), was computed on the said sum of $17,944, resulting in an excise tax of $1,794.40 for that month. That figure, multiplied by sixteen, the number of months from November 1951 to February, 1953, inclusive, fixed the total tax at $28,710. To that amount was added the sum of $28,710, representing the 100% penalty provided by Section 2707(a) of the Internal Revenue Code of 1939, made applicable by Section 3287 of the said Code, plus a 25% penalty of $7,177.60, pursuant to Section 325.36 of Treasury Regulations 132 (1939 Code). Those figures aggregate $64,598.40, to which was added the sum of $104.18, representing the special tax and penalties

for the period between November 1951 and June 30, 1953, assessed pursuant to Section 3290 of the Internal Revenue Code of 1939 (as added by Section 471, Revenue Act of 1951, (26 U.S.C.A.1952 Ed., Sec. 3290). The grand total, then, was $64,702.58.

The two questions to be decided here are:

1. Was the plaintiff engaged in the business of accepting wagers so as to make him liable for the 10% excise tax pursuant to Section 3285 of the Internal Revenue Code of 1939 (as added by Section 471 of the Revenue Act of 1951), (26 U.S.C.1952 Ed., Sec. 3285)?

2. If he was subject to said tax, was the assessment of $64,702.58 made by the Director of Internal Revenue on October 28, 1953 proper?

### As to the First Question

The evidence in the case clearly established that the plaintiff was engaged in the business of accepting wagers. Any doubt as to that was resolved by his plea of guilty to count 1 of the information filed on November 7, 1953, which charged that he *"did engage in the business of accepting wagers* in Nassau and Suffolk Counties, within the Eastern District of New York on the 1st day of December 1952."* (Emphasis mine.) The information charged further that he continued in the business of accepting wagers through February, 1953. His claim that he engaged in those activities as an accommodation for one Joe Byrd is utterly unworthy of belief.

The law is well settled that a judgment of conviction is conclusive of issues between the same parties therein determined. Judge Hartshorne, in the case of U. S. v. Ben Grunstein & Sons Co., D.C., 127 F.Supp. 907, discussed this matter fully at page 909 of his opinion in the following language: "The applicable principles of law may be briefly stated. They are based on the doctrine of collateral estoppel, i. e., that an issue once litigated and determined is decided for all time between the parties to the suit,

and therefore cannot thereafter be relitigated in a second proceeding between the same parties or their privies. State of Oklahoma v. State of Texas, 1921, 256 U.S. 70, 41 S.Ct. 420, 65 L.Ed. 831; Local 167 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers v. U. S., 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Emich Motors Corp. v. General Motors Corp., 1950, 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534. This principle applies when the first action is criminal and the second civil, provided the result in the criminal case was a conviction, Local 167 of [the] International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers v. U. S., supra; Emich Motors Corp. v. General Motors Corp., supra, though not when the criminal case resulted in an acquittal, due to the difference in the applicable rules as to the quantum of proof. Helvering v. Mitchell, 1938, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917; U. S. v. Gramer, 9 Cir., 1951, 191 F.2d 741, 27 A.L.R.2d 1132. Nor is it material whether the judgment of conviction result from a trial, as in the Local 167 and Emich Motors cases, or from a plea of guilty. U. S. v. Bower, D.C.E.D.Tenn.1951, 95 F.Supp. 19; United States v. American Packing Co., supra; U. S. v. Accardo, D.C.N.J.1953, 113 F.Supp. 783, affirmed 3 Cir., 1953, 208 F.2d 632; U. S. v. American Precision Products Co., D.C. N.J.1953, 115 F.Supp. 823; Blumen v. Haff, 9 Cir., 1935, 78 F.2d 833. Surely, if, after a criminal verdict against him, overruling his denial of guilt, one is not permitted to make further denial, he should not be permitted to do so, when, instead of denying guilt, he has previously formally admitted it. Indeed at times a plea of guilty is given greater scope than is a judgment of conviction after trial, as where the parties are not the same in the two proceedings. 31 A.L.R. 261, 278 (1924); 18 A.L.R.2d 1287, 1290 (1951); 5 Wigmore, Evidence, Sections 1066, 1346, 1671a."

I find, therefore, that the plaintiff was engaged in the business of accepting wagers so as to make him liable for the

10% excise tax pursuant to Section 3285, supra.

## As to the Second Question

The complaint alleges that the assessment of October 28, 1953, was "arbitrary, unwarranted and based upon unsupported information and conjecture" and, further, that it "was excessive, invalid and illegal". However, the plaintiff produced no evidence to support that claim or to controvert the Government's figures, nor did he deny the statements of Reinke, Hummel and Odess who testified that they placed bets with him, paid him when they lost, and were paid by him when they won.

As one engaged in the business of accepting wagers, the plaintiff was required by Section 3287 of the Internal Revenue Code of 1939 and Section 325.32 of Treasury Regulations 132 (1939 Code) to keep, *inter alia*, a daily record of the gross amount of all wagers received by him.

The plaintiff produced no records, and the Government was obliged, therefore, to use the figures obtained from the betting slips seized in the raid on February 26, 1953 in order to estimate the volume and extent of the plaintiff's business. In so doing it used the figures for the month of February, 1953 as a basis for the calculation of the volume of his business for the period of sixteen months from November, 1951, when Section 3285, supra, went into effect. Since the plaintiff kept no records the Government's method of calculation, while possibly not accurate, cannot be said to be unreasonable or improper.

Judge Weick, in the case of Hodoh v. United States, D.C., 153 F.Supp. 822, faced with a problem similar to that in the case at bar, said at page 825:

> "Plaintiff did not keep a daily record showing the gross amount of all wagers for which he was liable as required by law. 1939 I.R.C. § 3287, 26 U.S.C.A. (I.R.C.1939) § 3287. Nor did he keep any books or records in connection with the wagering business in which he was engaged.

> *"The Internal Revenue agents were, therefore, compelled to estimate the wagers.* In making the estimate, the agents received no cooperation from plaintiff. He claimed that he was not engaged in the wagering business, received no money for wagers and was, therefore, not liable for any tax. As before pointed out, the evidence indicates otherwise.

> "The Internal Revenue agents did the best they could do to arrive at proper figures. They took statements from plaintiff's solicitors, talked with Akron police officers, and drew upon their own experience in similar cases. They estimated plaintiff's daily take during the period in question as $500 based upon $10 for each of an estimated 50 solicitors and they made allowances for Sundays and holidays.

> *"It may be that the amounts so estimated by the agents are too large or too small. No one knows except the plaintiff and he will not tell. He kept no records from which correct figures could be obtained.*

> *"One thing is certain and that is that the plaintiff does owe some tax to the Government from the collection of wagers by him. The amount could only be estimated by the Internal Revenue agents because plaintiff did not keep the records required by law and furnished the agents with no information as to the nature and extent of his operations. Plaintiff offered no evidence in this Court from which a proper determination of the tax for which he was liable could be made.*

> "An action for refund of taxes claimed to have been erroneously collected is in the nature of the common-law action for money had and received and is governed by equitable principles. Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265; Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293;

Routzahn v. Brown, 6 Cir., 95 F.2d 766.

"The burden of proof in the case is upon the taxpayer to prove not only that the determination of the tax was wrong, but to produce evidence from which another and proper determination could be made. Lewis v. Reynolds, supra; Roybark v. United States, 9 Cir., 218 F.2d 164; Lightsey v. Commissioner of Internal Revenue, 4 Cir., 63 F.2d 254; Decker v. Korth, 10 Cir., 219 F.2d 732. The determination of tax made by the Commissioner is presumptively correct. Mayes v. United States Trust Co., 6 Cir., 280 F. 25.

"In other words, plaintiff must establish the proper amount of tax which he owes the Government. This he has not done. He has not sustained the burden of proof placed upon him by the law." (Emphasis added.)

Judge Weick's reasoning is equally applicable to the case at bar. I find that the plaintiff has failed completely to meet the burden of proof required to entitle him to a refund of the taxes collected from him.

▮ I find also that the Government's method of computing the tax by using the figures for February, 1953, as a base and making its calculations therefrom for the period of sixteen months from November 1, 1951, is reasonable and proper under the existing circumstances.

▮ I come now to the question as to whether there was such wilfulness as would subject the plaintiff to the 100% penalty provided for in Section 2707(a) of the Internal Revenue Code of 1939 and the 25% penalty under Section 325.36 of Treasury Regulations 132 (1939 Code) for failing to file returns. I find that his failure to pay, collect and file were wilful, and, hence, that he is subject to the penalties therefor.

Accordingly, judgment is granted in favor of the Government, dismissing the plaintiff's complaint, and granting judgment to the Government on its counterclaim in the sum of $64,598.40, less, of course, such sums as the Government may already have collected.

Submit findings of fact, conclusions of law, and decree in conformity herewith.