Lewis R. Williams v. Commissioner. Walter E. Kennedy v. Commissioner. Lewis R. Williams v. Commissioner.
Williams v. Commissioner
Docket Nos. 83719, 83720, 89456.
United States Tax Court
T.C. Memo 1962-302; 1962 Tax Ct. Memo LEXIS 6; 21 T.C.M. (CCH) 1609; T.C.M. (RIA) 62302; December 27, 1962
*6 Petitioners operated a numbers lottery as a partnership during 1954 to 1956, inclusive, and petitioner Williams operated the lottery as a sole proprietorship during 1957. Held: (1) Understatements of income from the numbers lottery determined for each of the years 1954 to 1957, inclusive; (2) Petitioners are liable for additions to tax for fraud pursuant to section 6653(b), I.R.C. of 1954, for each of the years involved; (3) Petitioners are liable for additions to tax for failure to file declarations of estimated tax for the year 1954, pursuant to section 294(d)(1)(A), I.R.C. of 1939. Hobart F. Atkins, Esq., 410 Cumberland Ave., S. W., Knoxville, Tenn., for the petitioners. Michael P. McLeod, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax and additions to tax as follows: Lewis R. Williams
Additions to Tax
Sec.
Sec. 294
6653(b)
(d)(1)(A)
Dkt.
I.R.C.
I.R.C.
No.
Year
Deficiency
1954
1939
83719
1954
$30,549.50
$15,274.75
$2,818.03
1955
31,429.31
15,714.65
1956
30,720.66
15,360.33
89456
1957
28,074.25
14,037.13
Walter E. Kennedy
83720
1954
30,024.83
15,012.41
2,768.49
1955
30,314.95
15,157.47
1956
27,967.17
13,983.58
*7 Certain adjustments are not contested by petitioners. The questions remaining for determination are (1) whether petitioners maintained adequate and proper books and records from which their taxable income could be computed for the taxable years involved; (2) whether respondent properly reconstructed petitioners' taxable income for the years involved; (3) whether petitioners are liable for the additions to tax provided by section 6653(b) of the Internal Revenue Code of 1954, for fraud; and (4) whether petitioners are liable for additions to tax for the taxable year 1954, as provided by section 294(d)(1)(A) of the Internal Revenue Code of 1939, for failure to file declarations of estimated tax. Findings of Fact The parties have stipulated certain facts. The stipulation of facts and the exhibits are incorporated herein by this reference. Lewis R. Williams and Walter E. Kennedy, hereinafter sometimes referred to as petitioners, are individuals who, during the taxable years involved, resided in Knoxville, Tennessee. Williams and Kennedy each filed individual income tax returns for the years 1954, 1955, and 1956, and Williams filed an individual income tax *8 return for the year 1957, with the district director of internal revenue, Nashville, Tennessee. Petitioners engaged in the operation of a "butter and eggs" and "races" lottery in and around Knoxville for many years. For the years 1954 to 1956, inclusive, they operated this wagering business as a partnership, one-half of the income of the partnership being distributable and taxable to each of the partners. During 1957 Williams alone operated the business, and all of the income therefrom was taxable to him. On March 28, 1952, both Williams and Kennedy were served with formal notices of inadequate records by the Internal Revenue Service. During the taxable years 1954 to 1956, inclusive, the partnership filed U.S. Partnership Returns of Income with the district director of internal revenue, Nashville, Tennessee. During the period from January 1, 1954, to June 30, 1956, the partners filed Forms 11-C, Special Tax Returns and Application for Registry - Wagering, with the district director of internal revenue, Nashville. The partnership filed Forms 730, Tax on Wagering, for each of the months from January 1953 to April 1956, inclusive. The Forms 730 disclose the following relevant *9 information with respect to reported wagers: Total Wagers
Excise
Period
Reported
Tax Paid
1953: Jan.
$8,205.45
$820.54
Feb.
7,958.87
795.89
Mar.
9,005.01
900.50
Apr.
8,908.43
890.84
May
8,697.09
869.70
June
8,415.90
841.60
July
8,416.88
841.68
Aug.
8,085.60
808.56
Sept.
7,591.14
759.11
Oct.
8,024.81
802.48
Nov.
7,005.41
700.54
Dec.
7,306.26
730.62
1954: Jan.
7,014.02
701.40
Feb.
1,010.16
101.01
Mar.
2,002.00
200.20
Apr.
2,600.00
260.00
May
2,836.06
283.06
June
2,071.83
207.18
July
2,031.93
203.19
Aug.
1,850.66
185.06
Sept.
2,051.58
205.15
Oct.
$1,955.01
$195.50
Nov.
2,056.43
205.64
Dec.
1,956.47
195.64
1955: Jan.
2,168.45
216.84
Feb.
2,306.45
230.64
Mar.
2,094.28
209.42
Apr.
1,992.06
199.20
May
1,896.91
189.69
June
2,036.88
203.68
July
1,308.24
130.82
Aug.
1,946.87
194.68
Sept.
2,004.68
200.46
Oct.
2,500.61
250.06
Nov.
2,755.86
275.58
Dec.
2,389.46
238.94
1956: Jan.
2,214.91
221.49
Feb.
1,910.49
191.04
Mar.
2,010.10
201.01
Apr.
1,817.79
181.77
During the period from November 1951 to January 1954 (27 months), petitioners reported *10 gross wagers on Forms 730, for excise tax purposes, averaging $9,062.94 per month. During the period from February 1954 to April 1956 the average gross wagers reported by petitioners on Forms 730 amounted to $2,065.79 per month. During the years indicated, petitioners accepted wagers from pick-up men as follows: Average No. of
Pick-up Men
Year
per Month
1952
11.6
1953
11.8
1954
14.5
1955
18.5
1956
23.2
During the three-day period, May 14 to May 16, 1956, inclusive, petitioners accepted wagers in the morning butter and eggs lottery in the amounts of $743.27, $542.34, and $672.36, respectively, from 38 different pick-up men, and paid out total hits of $28, $230, and $348, respectively. The following is a summary of petitioners' hit tickets from February 1954 to May 1956, seized by respondent's agents on May 17, 1956: Total Hits
Date
for the Month
1954: February
$ 510.00
March
973.00
April
1,403.00
May
1,729.60
June
1,937.00
July
3,279.00
August
2,495.31
September
1,427.22
October
Records not available
November
1,453.00
December
1,477.27
1955: January
$1,123.00
February
1,309.00
March
1,448.00
April
1,536.00
May
Records not available
June
Records not available
July
Records not available
August
Records not available
September
Records not available
October
1,401.00
November [1]
275.00
December
Records not available
1956: January [2]
233.00
February
12,132.00
March
8,485.00
April
6,288.45
[3]
2,705.71
*11 For the month of January 1954, petitioners paid out hits totaling $3,270. The following compares hits paid out by petitioners in the months of February, March, and April 1956, as indicated by petitioners' records, with hits disclosed by tickets seized by respondent's agents: Per Petitioners'
Per Seized
1956
Records
Hit Tickets
February
$1,119
$12,253.90
March
1,561
8,683.00
April
907
5,898.00
A seized record of petitioners' operations for May 18, 1955, discloses wagers turned in by 22 pick-up men in the total amount of $950.23 and hits of $417. Columns 2 and 4 of the seized record, which appear to represent the amounts turned over to petitioners by the pick-up men, disclose figures equal in each instance to about 80 percent of the total wagers listed in columns 1 and 3. During the years involved, petitioners destroyed lottery tickets, with the exception of hit tickets, after holding all tickets for the three-day so-called "overlook" period. The petitioners reported on their individual income *12 tax returns distributable shares, or taxable income, from the partnership as follows: Year
Kennedy
Williams
1954
$ 422.86
$ 422.86
1955
2,810.54
2,810.55
1956
2,644.76
2,644.76
The partnership accepted gross wagers for the years and in the amounts which follow: Year
Amount
1954
$162,976.98
1955
169,841.02
1956
170,501.88
Williams accepted gross wagers of $84,590.07 in 1957. Hits, or pay-outs, for winning bets amounted to approximately 50 percent of gross wagers in each of the years involved. Commissions paid to or retained by runners or pick-up men amounted to 20 percent of gross wagers for each of the years involved. Petitioners' distributable shares of partnership income were as follows: Year
Kennedy
Williams
1954
$21,899.43
$21,899.43
1955
23,130.83
23,130.83
1956
22,056.93
22,056.93
Williams realized income from his lottery operations in 1957 in the amount of $21,803.61. On July 21, 1958, both Kennedy and Williams entered pleas of guilty in the United States District Court for the Eastern District of Tennessee, Knoxville, Tennessee, to an indictment for conspiring to defraud the United *13 States of wagering, excise, and occupational taxes for the period February 1, 1954, to June 12, 1956, inclusive. Kennedy and Williams also entered pleas of guilty on the same date and in the same court to a second indictment of five counts charging them with willful evasion of wagering excise taxes for each of the months February 1954, May 1955, February 1956, March 1956, and April 1956. As a result of the above pleas of guilty, Kennedy and Williams were sentenced to 30 days in jail on each count, the sentences to run consecutively. Prior to the pleas of guilty, petitioners made a motion in the United States District Court for the Eastern District of Tennessee to suppress the evidence obtained by officers of the Internal Revenue Service in raids, pursuant to Federal search warrants, on petitioners' places of operations at 112 1/2 E. Vine Street, Knoxville, Tennessee, and Florence's Beauty Salon, Nance Road, Knoxville, Tennessee. The motions to suppress the evidence, as they pertained to Kennedy and Williams, were denied. Petitioners did not maintain adequate books and records from which their taxable incomes properly could be computed for any of the years involved. Petitioners *14 did not file declarations of estimated tax for the year 1954. For the years 1954 to 1957, inclusive, petitioner Williams understated his taxable income on his individual income tax returns in at least the following amounts: Year
Amount
1954
$21,476.57
1955
20,320.28
1956
19,412.17
1957
19,499.65 *
For the years 1954 to 1956, inclusive, petitioner Kennedy understated his taxable income on his individual income tax returns in at least the following amounts: Year
Amount
1954
$21,476.57
1955
20,320.29
1956
19,412.17
A part of the deficiency for each of the taxable years 1954 to 1957, inclusive, for Williams, and 1954 to 1956, inclusive, for Kennedy was due to fraud with intent to evade and defeat taxes. Opinion This case involves the alleged fraudulent understatement of income from a numbers lottery operated by both petitioners during 1954, 1955, and 1956, and by petitioner Williams during 1957. In May of 1956 respondent's agents raided certain premises used by petitioners in their lottery business, and there seized sundry gambling tickets. From these *15 tickets respondent has reconstructed petitioners' gambling income for each of the years involved. Petitioners argue first that the searches and seizures referred to above were made in violation of the fourth amendment to the Constitution of the United States. Petitioners' position is that the search warrant, pursuant to which the raid was made, was issued without a sufficient affidavit having been made to the United States Commissioner. At trial, introduction of the seized evidence over petitioners' objections was permitted, and we do not now have reason to reverse our ruling on the point. Prior to a criminal trial, petitioners moved to suppress the very evidence here involved, on the grounds of illegal search and seizure. The United States District Court for the Eastern District of Tennessee denied the motion. Such denial in the District Court, which properly has jurisdiction over the matter, settles the issue of the legality of the search and seizure and is determinative herein. Moreover, even assuming that we have jurisdiction with respect to this matter, there has been no showing that the search was made other than upon a valid warrant. The warrant is sufficient on its face and *16 declares that it was made upon the basis of a sufficient affidavit. Petitioners did not introduce the underlying affidavit. Accordingly, there is nothing in the record before us belying the sufficiency of the warrant pursuant to which a search was made. Petitioners argue next that they kept full and adequate records of their wagering business which are in accordance with the returns filed by them, and that the respondent was not justified in recomputing their income. The records maintained by petitioners were first produced by them the day before the trial of this case. It is not clear whether respondent previously made specific requests for records of the petitioners. Nevertheless, the fact that petitioners did not previously produce the records tends to raise questions with respect thereto. First, we think it is clear that petitioners' records, which constitute merely a summary of wagering tickets destroyed by petitioners, are not conclusive of themselves. They are merely summary notebooks, and petitioners may not thereby "hide behind an inpenetrable wall." Anthony Delsanter, 28 T.C. 845, 857, affd. as to this issue 267 F. 2d 39 (C.A. 6, 1959); Federal National Bank of Shawnee, 16 T.C. 54, *17 petition for review dismissed 191 F. 2d 402 (C.A. 10, 1951). Secondly, petitioners previously entered pleas of guilty to criminal charges involving understatement of gross wagers. Since the records here involved contain the same figures for gross wagers as were reported by petitioners on the returns with respect to which they were criminally charged, their pleas of guilty may be considered as admissions of the inaccuracy and inadequacy of the records. In a number of respects the records have been demonstrated to be, at the least, inaccurate. A seized record of petitioners' operations for May 18, 1955, discloses gross wagers of $950.23, whereas petitioners' records for that day show gross wagers of only $58.89. Hit tickets for the months of February, March, and April of 1956 show hits totalling $12,253.90, $8,683, and $5,898, respectively, whereas petitioners' records for the same months disclose hits of $1,119, $1,561, and $907, respectively. It is highly improbable that understatements of wagering losses were not accompanied by understatements of gross wagers. Testifying with respect to operation of the business in 1957, petitioner Williams stated that he operated *18 the lottery for the first 6 months of that year. Curiously, the records he produced for 1957 show operations for only the last 6 months of 1957 when he said he was out of the business entirely. The accuracy of petitioners' records is further brought into question by the unexplained drop in reported gross wagers from January 1954 to February 1954 and by alterations through erasure of amounts recorded on the envelopes containing hit tickets for February 1954. All of the above evidence satisfies this Court that petitioners' records for all of the years were both inadequate and inaccurate, and that respondent was justified in resorting to other methods of determining petitioners' respective incomes from the lottery business. Meyer J. Safra, 30 T.C. 1026; Nellis v. Commissioner, 232 F. 2d 890 (C.A. 6, 1956), affirming per curiam a Memorandum Opinion of this Court; O'Neill v. United States, 198 F. Supp. 367 (E.D.N.Y., 1961). We have examined carefully the method of reconstruction used by respondent. At the time of raiding petitioners' premises, respondent's agents picked up all of the morning or butter and eggs lottery tickets for May 14, 15, and *19 16, 1956. These tickets showed gross wagers received averaged $660.86 per day for the three-day period. Using a five-day work week and excluding all holidays, respondent reconstructed petitioners' gross wagers by multiplying $660.86 by the number of days in each of the years involved on which wagering activities were conducted. A similar method of reconstructing gambling income was approved in O'Neill v. United States, supra. In judging the propriety of this method it must be noted first that the absence of sufficient records is a condition of petitioners' own making and that the records of these three days in May are the only complete records available with the exception of that discovered relating to a single day's operation in May of 1955. The reasonableness of the method employed by respondent may be tested by certain other information. It is clear that in the operation of their lottery petitioners received the wagers placed through runners who turned in tickets to petitioners. In 1953 petitioners reported monthly wagers averaging $8,301.74. During 1953 they had an average of approximately 11.8 runners per day. The average number of runners per day increased to *20 14.5 in 1954, or by 23 percent. Applying a similar increase to monthly wagers, the average of monthly wagers for 1954 would be $10,211.14. Using the same method with respect to 1955 when the average number of runners was 18.5, or an increase of 28 percent over the number of runners in 1954, a monthly gross wager average of $13,074.47 is arrived at. Similarly, the average number of runners increased to 23.2 in 1956, or by 25 percent over 1955, and an average monthly gross wager figure of $16,338.08 is thus derived. We do not have evidence of the number of runners utilized in 1957; however, there is nothing in the record to indicate that their number decreased from 1956. This analysis lends support to the reasonableness of respondent's computation of an estimated average monthly total of gross wagers of something over $14,000. Employment of another method of analysis likewise corroborates the results reached by respondent in determining estimated gross wagers. Seized hit tickets for the months of February, March, and April 1956, which appear to be the only hit tickets not altered by petitioners, disclose a total of $26,905.45 in total hits for the 3 months. Since the odds operable *21 in this kind of lottery operation consist of 500 to 1 payments on a single number which is one of 999, it appears that the resultant ratio of hits to gross wagers is 1 to 2. In other words, the probability for hits is 50 percent of gross wagers. Employing this ratio, a total for gross wagers for the three-month period is $53,810.90, or a monthly average of $17,936.97. Returning to the number of runners employed in each year, the following analysis obtains: There was a 20 percent decrease in the number of runners from 1956 to 1955. A similar percentage decrease in average monthly gross wagers being postulated, we derive a monthly average of $14,349.58 for 1955. The decrease from 1955 to 1954 in the number of runners was 22 percent. Thus, we arrive at average monthly gross wagers for 1954 of $11,192.67. The decrease in the number of runners from 1954 to 1953 was approximately 19 percent. A similar decrease in average monthly gross wagers from 1954 to 1953 results in postulated monthly gross wagers in 1953 of $9,066.06, which may be compared with [a] reported monthly gross wagers average of $8,301.74 for 1953. Again, respondent's figures on the average are corroborated by this analysis *22 and additionally the 1953 figure thus roughly computed is not significantly out of line with reported gross wagers for 1953. In addition, it should be noted that gross wagers reported by petitioners for the period November 1951 to January 1954, inclusive, averaged $9,062.94 per month. In reflecting upon this final figure the increases in the number of runners over those used in 1953 are noted. One additional corroborative item of respondent's computations is the record of petitioners' operations of May 18, 1955, which discloses wagers in the total amount of $950.23 turned in by 22 pick-up men and hits thereon in the total amount of $417, or hits of approximately 43 percent. For all of the above reasons and in the absence of sufficient records maintained by petitioners, respondent's method of reconstruction of petitioners' gross wagers appears appropriate with a single caveat. Respondent made a computation for the month of January 1954. It appears that the sharp drop in monthly wagers reported came in February 1954, and that petitioners' record of operations for the month of January 1954 is at least consistent with prior years. For that reason, gross wagers for the month of January *23 have not been increased from the figures reported by petitioners and reflected in their books. As noted above, pay-outs for hits are appropriately postulated at 50 percent of gross wagers in this kind of a lottery operation. Cf. Hackerman v. Commissioner, 229 F. 2d 959 (C.A. 6, 1955), affirming per curiam a Memorandum Opinion of this Court Accordingly, for the purposes of arriving at deficiencies in this case, hits have been computed as 50 percent of gross wagers. In addition, it appears from the record that petitioners' runners received 20 percent of gross wagers for their efforts. This commission, or percentage, also is reflected in the determination of the deficiencies in this case. The remaining question is whether any part of the deficiencies in tax for each of the years involved was due to fraud with intent to evade tax. Respondent has the burden of demonstrating fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. It is manifest that respondent has met the burden of demonstrating fraud for each of the years and with respect to each of the petitioners here involved. Records were altered. Underlying records were destroyed or *24 have been concealed. Income was systematically understated in substantial amounts in each of the years involved. These indicia of fraud are convincing. Spies v. United States, 317 U.S. 492. In addition, petitioners pleaded guilty to charges of criminal fraud with respect to the understatement of gross wagers. Thus, these pleas of guilty have a significant bearing in the instant controversy. For all of these reasons, it is clear that at least part of the deficiencies in each of the years involved for each petitioner was due to fraud with the intent to evade taxes. Respondent determined that each petitiones is liable for additions to tax pursuant to section 294(d)(1)(A) for failure to file declarations of estimated tax for 1954. The failure to file and the requirement to file having been demonstrated, the additions may be avoided only by showing that the failures were due to reasonable cause. No such evidence has been produced. Accordingly, petitioners are liable for additions to tax under section 294(d)(1)(A) for the year 1954. Decision will be entered under Rule 50. Footnotes
1. Records available for only 5 days of the month. ↩
2. Records available for only 2 days of the month. ↩
3. For period 5/1/56 through 5/16/56.↩
*. Includes $1,000 increase in capital gains at 50 percent includability.↩