ELMER KRASSNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krassner v. Commissioner
Docket No. 2881-72.
United States Tax Court
T.C. Memo 1974-223; 1974 Tax Ct. Memo LEXIS 96; 33 T.C.M. (CCH) 990; T.C.M. (RIA) 74223; August 28, 1974, Filed. Herbert Biegelman, for the petitioner. H. Stephen Kesselman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: *97 Additions to tax year
Deficiency
Sec. 6651(a), I.R.C. 1954
Sec. 6653(a), I.R.C. 1954
Sec. 6654(a), I.R.C. 1954 1967
$16,160.08
$3,959.33
$808.00
$504.22
1968
$17,488.37
$4,285.65
$874.42
$545.79
The issues for decision are: 1. whether petitioner had unreported theft income of $38,000 or any amount for each of his taxable years 1967 and 1968, respectively. 2. Whether petitioner is liable for additions to tax for either 1967 or 1968 or both: (a) under section 6651(a) [1] for failure to file a return; (b) under section 6653(a) for negligence or intentional disregard of rules and regulations; and (c) under section 6654(a) for failure to pay estimated income taxes. FINDINGS OF FACT Elmer Krassner (hereinafter petitioner) resided in Hempstead, New York, at the time he filed his petition in this case. He filed no income tax returns for 1967 and 1968. However, during these years he was employed by the Parking Meter Division of the New York City Deparmtnet of Finance and received *98 a salary as a parking meter coin collector. Although petitioner had been employed by the City of New York for approximtely 20 years prior to 1967, he had worked for the Parking Meter Division only since 1956. Petitioner's salary amounted to $4,747.83 in 1967 and $5,127.32 in 1968. During these years, petitioner also received an Army disability pension of approximately $80 per month. Parking meter coin collectors and drivers worked in teams consisting of two collectors and one driver. The Parking Meter Division employed approximately 30 to 40 collectors and 12 to 15 drivers. Sometimes, due to absences, a collector would be assigned to drive a truck. The dispatchers made assignments on a daily basis, and the collectors never knew which truck they would be assigned to or whom they would be working with until they arrived at work. On occasion the dispatcher would change assignments on the request of a collector or driver. After being assigned to a truck, a collector was given keys for the parking meters from which he would be collecting that day. In addition, he would receive maps of the areas assigned to him. After arriving in an assigned area, the driver would lock a master *99 canister onto each collector's wagon. One collector would take one side of the street and one would take the other, and each collector would empty the meters allotted to his master can. When the collector had completed collections in a designated location, he was required to return to the truck, where his master can would be exchanged for an empty one. Upon completion of their rounds, the collectors would return to the Department of Finance garage where the master cans were taken off the truck, put on a conveyor, and sent to an upstairs office to be emptied. The collectors would then check a roster to see if any cans were to be loaded onto the truck for the next day. If not, they turned in their reports, keys, and maps, checked out, and went home. On August 30, 1967, the office of the New York City Deputy Commissioner of the Department of Investigation was informed that parking meter collectors and motor vehicle drivers employed by the Parking Meter Division were regularly stealing coins during their collections. On February 16, 1968, Thomas Edwards (Edwards), a detective in the New York City Police Department assigned to the Department of Investigation, began working as an *100 undercover agent in the Parking Meter Division. Edwards worked as a parking meter collector until December 6, 1968. During the years at issue, two types of parking meters were used in New York City. The first type, used primarily in parking lots in Queens and Brooklyn, had no interior coin box so that when the door to the meter was opened, the coins inside usually fell out freely. This meter was emptied by means of a goose-necked apparatus having a funnel at the top which was positioned under the door of the meter. The coins would fall into the funnel and then go through a series of baffles before entering the master can. Once the coins had passed beyond the baffles, they could not be removed from the can without breaking a seal. By placing a rubber ball in the funnel, however, one could keep the coins from passing through the baffles and into the master can. These coins could then be misappropriated when the master can was returned to the truck. A second, more commonly used meter contained a small sealed coin box to receive deposited coins. Collectors rarely found loose coins in these meters. After removing the sealed coin box from this type of meter, the collector would *101 insert it into the master can, push a button, and then turn the coin box until a key in the master can opened a door on the coin box. [2] The coins would fall into a passageway leading through a series of baffles into the master can. The coins could then be removed from a can only by breaking a seal. By placing a tape-reinforced cardboard strip of the proper size in the passageway on top of the master can, however, the coins could be prevented from passing through the baffles and into the master can and could be misappropriated when the can was returned to the truck. During the 10 months Edwards worked as a parking meter collector, he observed petitioner arriving at work on most of the mornings petitioner reported to work. He also often saw him leaving work when they returned from their rounds at the same time. He particularly noted that petitioner always carried a small black bag to and from work. In the morning, petitioner appeared to carry it quite easily, but in the afternoon when he left work the bag appeared to be heavy because petitioner's arm would be very stiff and pressed close *102 to his body. Petitioner carried his black bag with him at all times. When he made his rounds, the bag stayed in the truck. He kept his lunch, extra keys and chains, gloves, rubber balls, taped strips, and a pair of pliers in it. The pliers, which had been issued to him and to other parking meter coin collectors, were used, if needed, to insert the parking meter keys into the meters. On December 6, 1968, petitioner and 21 other collectors and drivers [3] were arrested for stealing coins. That day petitioner came to work with approximately $2 to $3 in change in his possession. When arrested, he had $27.45 in dimes and quarters in his jacket pockets and approximately $384 in dimes and quarters in the black bag which he was carrying.The black bag also contained three rubber balls and three taped strips. Of the 21 other collectors and drivers searched and arrested on December 6, 1968, all but one had loose coins in their possession. Of the 20 who had loose coins, all but one had over $250 in dimes and *103 quarters. Some of the collectors and drivers arrested with petitioner also had rubber balls and taped strips in their possession. Petitioner's arrest occurred when he stepped off the truck upon returning to the Department of Finance garage. Petitioner contended that most of the coins on his person and in his black bag were loose coins found in the parking meters from which he had collected that day. He claimed that he was on his way to the dispatcher's office to turn them in, as he was required to do and as he claimed he had frequently done in the past. On that day, petitioner had emptied meters having the small sealed coin box. Edwards had never found more than $2 in loose coins during a day of emptying this type of meter.
Petitioner subsequently pleaded guilty to petit larcency. At the time of his arrest, petitioner was in his early 50's and, as a New York City employee, would have been eligible to retire with a lifetime pension at age 55. However, as a result of his plea, he lost his position with the Parking Meter Division and all pension rights. Petitioner was entitled to 27 work days of vacation a year, i.e., approximately 5-1/2 weeks. During the years at issue, *104 he made two trips to Florida with his family. On one occasion they drove an automobile, and on the other they traveled by airline. Even though the collectors had a 5-day work week, petitioner did not come to work every day. When he was absent from work, he would take either vacation or sick leave. Respondent determined that petitioner realized unreported theft income of $38,000 in each of the years 1967 and 1968. In addition, a 25-percent addition to tax provided by section 6651(a) was asserted for both years since petitioner did not file an income tax return for either year. Also, the 5-percent addition to tax provided by section 6653(a) was imposed for both years on the ground that the underpayment was due to negligence or intentional disregard of rules and regulations. Respondent further determined that the addition to tax under section 6654(a) was warranted for both years since petitioner had failed to prepay estimated income taxes for those years. OPINION 1. Theft Income Petitioner filed no Federal income tax returns for 1967 and 1968. During these years, in addition to his salary as a parking meter coin collector, he realized substantial additional income due *105 to misappropriations of money in the course of his collections. Based upon a projection from the amount of coins petitioner had on his person when arrested (approximately $400), respondent determined the amount of his thefts to be $38,000 in each year. This determination was based on an estimate that petitioner misappropriated approximately $800 per week for 48 weeks (about $400 on 2 days of each week) of each year. This determination is prima facie correct and petitioner has the burden of showing that it was erroneous. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner, relying on Helvering v. Taylor, 293 U.S. 507 (1935), and Federal National Bank v. Commissioner, 180 F.2d 494 (C.A. 10, 1950), contends, however, that respondent's determination was arbitrary and excessive and should not be regarded as prima facie correct. He maintains that respondent disregarded his intent to turn in the coins in his possession at the time of his arrest. Petitioner also urges that there is no factual basis for the premise that he realized as much as $800 per week from his thefts or that his thefts *106 occurred throughout the entire 2-year period at issue. Petitioner argues that as a result, The burden of proving the amount of tax owed shifted to respondent. Where the taxpayer has filed no returns and kept no records from which his true income can be determined, respondent is given "great latitude" in determining taxable income. Joseph F. Giddio, 54 T.C. 1530, 1532-1534 (1970). He is not required to use either the "bank deposit" or "net worth" method but may use any reasonable method which clearly reflects the taxpayer's income. Harold E. Harbin, 40 T.C. 373, 377 (1963). And where the taxpayer fails to keep records, he may not complain that the respondent resorted to approximation. The Supreme Court has held that mathematical exactness is not essential in such a case because that "would be tantamount to holding that skilful concealment is an invincible barrier to proof." United States v. Johnson, 319 U.S. 503, 517-518 (1943). See also Rouss v. Bowers, 30 F.2d 628, 629-630 (C.A. 2, 1929), certiorari denied 279 U.S. 853 (1929). Respondent's projection of taxable income based upon evidence of an average day's *107 receipts is a permissible method of indirectly computing income. [4] Petitioner has made no showing that respondent's projection was not based on an average day or that it produced an unrealistic result. In the final analysis, his "evidence" is limited to an oral, general denial of the correctness of the amount determined by respondent, and his denial is not corroborated by evidence of any kind. petitioner admitted the he misappropriated money in both 1967 and 1968. He filed no tax returns for those *108 2 years, the only years for which he had ever failed to file returns. He admittedly had theft income in those years. The only issue is the amount. Petitioner claimed that he took only "car fare," estimated at $200 to $300 per year, but he kept no records from which correct figures on his misappropriations could be obtained, thus compelling the Internal Revenue Service to estimate the amount of his thefts. Cf. O'Neill v. United States, 198 F. Supp. 367, 370 (E.D.N.Y. 1961). Admittedly, the amount of the misappropriations on a single day is not an entirely satisfactory standard for estimating the amount of petitioner's thefts over a 2-year period. However, by the very nature of the theft activities here involved, a precise determination of the amounts stolen on more than one occasion could hardly be made. Taking into account all the evidence, we do not think petitioner has shown that respondent's determinations were arbitrary or without rational foundation. [5]
*109 exculpatory claims are largely incredible. He testified that the $400 in coins in his possession at the time of his arrest were loose coins found in the meters that day and that he intended to turn them in. This testimony is in stark contrast with that of Detective Edwards who testified that the greatest amount in loose coins he ever found in a single day in the coin-box type of meter, from which petitioner had collected on the day of his arrest, was about $2. Petitioner's testimony regarding the reasons his black bag contained rubber balls (i.e., for play with his dogs) and taped strips (i.e., for use in his glove when striking meter keys) is not credible. Each collector was given a pair of pliers for use, if necessary, in inserting the meter keys, and petitioner testified that he carried and used these pliers on his rounds.Edwards never saw a collector strike a meter key with the palm of his gloved hand in order to force the entry of the key. Petitioner testified that a relative gave him several thousand dollars each year, enabling him to deposit $10,000 to $12,000 in his bank accounts despite his much smaller receipts from his salary and pension, but he offered no testimony *110 or other evidence to corroborate the fact or the amount of either the deposits or the gifts even though his relatives lived nearby at the time of the trial. It is true that the thefts required the complicity of the driver and that only 6 of the 12 to 15 drivers employed by the Parking Meter Division were named in the search warrant. This means that thefts likely occurred on only about 40 to 50 percent of the trips, i.e., on an average of 2 or 2-1/2 days per week. However, the employees were allowed, at least to some extent, to control their assignments and in this manner could increase their theft opportunities. In any event, respondent used the lower figure of 2 days per week in determining petitioner's weekly theft income. One adjustment to respondent's determination, we think, is in order. Respondent's determination is based on a finding that peitioner misappropriated coins during 48 weeks of each year. Petitioner admittedly was entitled to approximately 5-1/2 weeks of vacation each year, and he apparently took the full amount of his vacation time. In addition, he was entitled to sick leave, and respondent made no adjustment for illnesses. We think it more reasonable *111 to conclude that petitioner worked 44 weeks in 1967. He was arrested on December 6, 1968, and thus worked only about 40 weeks in 1968. Careful consideration of all the evidence leads us to conclude that petitioner had theft income of $35,200 ($800 per week for 44 weeks) in 1967 and $32,000 ($800 per week for 40 weeks) in 1968. If the deficiencies so determined are excessive, petitioner has no one to blame but himself since he failed to keep any records of his misappropriations and failed to provide us with any evidence indicating the proper amount of his theft income or otherwise showing that respondent's determinations were excessive. See Arthur Figueiredo, 54 T.C. 1508, 1513 (1970), affirmed per order C.A. 9, March 14, 1973. 2. Additions to Tax (a) Section 6651(a) We sustain respondent's imposition of a 25-percent addition to tax for both years under section 6651(a) for failure to file a return since petitioner did not show that his failure to file was due to reasonable cause and not willful neglect. Petitioner testified that his failure to file returns was due to neglect. His only explanation for not filing a return for either of the years at issue *112 was that he assumed this was not necessary since Federal income tax was being withheld from his wages. This argument is not persuasive in light of his testimony that he filed returns for all years prior to and subsquent to the years at issue. (b) Section 6653(a) Respondent also determined additions of 5 percent for both years under section 6653(a) for negligence or intentional disregard of rules and regulations. In light of petitioner's admission that he was negligent in not filing returns, we sustain these additions. (c) Section 6654(a) We also sustain respondent's imposition of the addition to tax under section 6654(a) for failure to pay estimated income tax for each of the years at issue. This addition is mandatory and unless petitioner shows that he fits within one of the exceptions listed in section 6654(d), it "is imposed whether or not there was reasonable cause for the underpayment." Sec. 1.6654-1(a) (1), Income Tax Regs.; Estate of Barney Ruben, 33 T.C. 1071, 1072, (1960). Petitioner has not shown that any of the exceptions applies. Decision will be entered under Rule 155. [6]
*113 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years at issue, unless otherwise noted. ↩
2. After being emptied, the coin box was returned to the meter, which was then locked. ↩
3. The search warrant issued as a result of Edwards' reports named 22 collectors and 6 drivers. The 6 named employees not arrested did not report for work on Dec. 6, 1968. ↩
4. Shades Ridge Holding Co., T.C. Memo. 1964-275, affirmed sub nom. Fiorella v. Commissioner, 361 F.2d 326 (C.A. 5, 1966); Isaac T. Mitchell, T.C. Memo. 1968-137, affd. 416 F.2d 101 (C.A. 7, 1969), certiorari denied 396 U.S. 1060 (1970); O'Neill v. United States, 198 F. Supp. 367 (E.D. N.Y. 1961); Hamilton v. United States, 309 F. Supp. 468 (S.D.N.Y. 1969), affd. 429 F.2d 427 (C.A. 2, 1970), certiorari denied 401 U.S. 913 (1971). Compare Pizzarello v. United States, 408 F.2d 579 (C.A. 2, 1969), certiorari denied 396 U.S. 986↩ (1969). 5. Detective Edwards, who served as an undercover investigator of the case for about 10 months, testified that, on the basis of his observations, each individual involved in the thefts was taking about $1,000 per week. ↩
6. As to petitioner's eligibility for the benefits of secs. 1301-1305, see Louis Richard Hosking, 62 T.C. No. 72 (Aug. 19, 1974); Rev. Rul. 66-306, 1966-2 C.B. 356↩.