Isaac T. Mitchell and Esther Mitchell v. Commissioner.
Mitchell v. Commissioner
Docket No. 231-66.
United States Tax Court
T.C. Memo 1968-137; 1968 Tax Ct. Memo LEXIS 165; 27 T.C.M. (CCH) 670; T.C.M. (RIA) 68137; June 27, 1968, Filed *165 Elmer E. Lyon, 600 Circle Tower, Indianapolis, Indiana, for the petitioners. Bernard J. Boyle, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax, as well as additions to tax under section 6653(b) of the Internal Revenue Code of 1954, [1] as follows: Year
Deficiency
Addition to TaxSec.
6653(b)
1958
$355,237.22
$ 177,618.61
1959
349,761.70
174,880.85
1960
359,918.74
179,959.37
1961
345,441.26
172,720.63
1962
343,871.90
171,935.95
The issues presented for our decision are whether respondent correctly determined (1) that petitioners understated their income in each of the years 1958 through 1962, and (2) that petitioners are liable for additions to tax for fraud for each of the years 1958 through 1962 under section 6653(b) of the 1954 Code. [2] Findings of Fact Some of the facts have been stipulated *166 and are found accordingly. Isaac T. Mitchell and Esther Mitchell, husband and wife, resided in Indianapolis, Indiana, at the time the petition was filed herein. During the taxable years in question, 1958 through 1962, they filed joint Federal income tax returns on a calendar year basis with the district director of internal revenue, Indianapolis, Indiana. The returns filed by petitioners were prepared on the cash receipts and disbursements method of reporting income and were based upon purported increases in net worth plus personal expenditures. Since Esther Mitchell is joined here only by virtue of such joint returns, the term "petitioner" will hereinafter be used solely with respect to Isaac T. Mitchell. The Commissioner's statutory notice of deficiency, covering all years in question, was mailed to petitioners on October 21, 1965. Petitioners filed their Federal income tax returns for 1958, 1959, and 1960 on April 21, 1959, April 15, 1960, and April 15, 1961, respectively, all of such dates being more than 3 years prior to the mailing of the Commissioner's notice of deficiency. Prior to the expiration of the statutory 3-year period of limitations for the year 1961, petitioners and *167 the district director of internal revenue, Indianapolis, Indiana, on or about March 20, 1965, and March 23, 1965, respectively, duly executed Treasury Form 872 consenting to the extension of time for 671 the issuance of the notice of deficiency for that year to December 31, 1965. During the taxable years in question and for many years prior thereto, beginning in 1945 or 1946, petitioner engaged in various income-producing activities including the gambling business which involved a pool or numbers lottery. [3] During those years, petitioner informed the certified public accountant who prepared his tax return that he was not in the business of gambling, but that his gambling was of a personal nature only. In their income tax returns for the years involved, petitioners reported taxable income and income tax liability as follows: Year
Taxable Income
Income
Tax Liability
1958
$11,406.48
[1] $ 2,575.81
1959
32,638.07
10,719.04
1960
10,697.34
2,381.31
1961
37,632.84
13,216.42
1962
29,625.40
9,509.54 [1] In addition to other items of income, petitioners reported the following amounts *168 as the excess of income over losses from gambling: Year
Amount
1958
$ 5,713.31
1959
24,683.13
1960
1,034.06
1961
31,188.59
1962
23,225.13
The Commissioner, in his notice of deficiency, determined that petitioner had additional gambling income in the following amounts: Year
Amount
1958
$438,654.19
1959
417,974.37
1960
442,414.44
1961
411,584.86
1962
413,842.37
The amounts of additional gambling income were arrived at by first determining petitioner's average annual gambling income from a projection made of income and expense figures obtained as a result of a raid upon petitioner's numbers operation on June 7, 1963. From those figures, the Commissioner deducted the amounts of gambling income which had been reported by petitioner on his returns for the years in question, as well as other amounts, which though reported by petitioner as income, had not been labeled gambling income. Petitioner's numbers operation was essentially a betting game in which an individual bet money on a combination of numbers. The winning combination, or number, was determined each day after the close of the New York Stock Exchange and was based upon certain stock market indexes. The betters could wager from a penny to $10 on a three-way *169 number (combination of three numbers) and from a penny to $3 on a four-way number. While the odds to correctly select a three-way number are 1,000 to 1, a winning better received a payout of approximately 500 to 1, winning approximately $500 on a $1 bet. Similarly, while the odds to correctly select a four-way number are 10,000 to 1, the winning better received a payout of approximately 2,500 to 1, winning approximately $2,500 on a $1 bet. [4] *170 The dollar volume of bets placed with petitioner was greatest on Mondays. The bets were written in duplicate by bookmakers, or writers, [5] *172 who gave one copy to the better and retained the other for the business. The writer usually withheld 35 percent of the gross amount of the bets as his commission. The remaining 65 percent, or "low book," together with the bet slips, were collected daily from the writers by the pick-up men, or "bagmen." Although the writers would ordinarily begin at a commission of only 25 percent of gross bets, their commission usually reached 35 percent during the years in question. However, even if the writer took less than 35 percent, his pick-up man would never turn in more than 65 percent of the total dollar amount of bets placed. During the years in question, 11 or 12 pick-up men were employed by petitioner, although during the period June 3 to 6, 1963, petitioner employed only 11 pick-up men. Each pick-up man received as his commission 8 percent of the low book, which amounts to 5.2 percent of 672 the total amount bet. The bet slips and low book were taken by the pick-up men to the central office, or "count house," [6] where *171 all bet slips were examined, totaled, and the winning slips determined. Bet slips were kept at the count house for approximately one week, after which period they were burned. The need for retaining them during that period arose from the fact that occasionally certain winning tickets, for one reason or another, were overlooked by petitioner's employees and were not paid off. By preserving the bet slips for a week, petitioner could verify claims made by the holders of such winning tickets, or "overlooks." Overlooks were fairly common and occurred on a daily basis. After the winning number, or "hit," was determined each day, employees at the count house would prepare an adding machine master tape which would reflect the low book and hits for that day, broken down for each pick-up man. The amount of each pick-up man's low book, less his 8 percent commission and less the hits attributable to his writers, were then turned in daily to Van Wert Mullin (hereinafter Mullin), one of petitioner's employees, who received a carbon copy of the daily master tape, the original of which was given to petitioner. From the money turned in to Mullin, he paid salaries to the count house employees in the following amounts: Employees
Annual Salary (1958
thru 1962)
Van Wert Mullin
$10,400 [1]
Isadore Mikell
5,200
William Jackson
5,200
Louina Jones
2,600
$23,400
Mullin also used the funds to pay attorneys, bondsmen, and fines in connection with the release of any pick-up men who had been arrested by the police. [7] From the same source of money, Mullin paid Federal excise tax on wagering for the years in question in the following amounts: Year
Amount
1958
$ 6,085.32
1959
5,710.01
1960
6,302.87
1961
8,613.87
1962
10,700.86
These payments were made in the name of Mullin but were *173 paid out of funds which the Commissioner has attributed as gross income to petitioners. After all the foregoing expenses were paid, Mullin prepared a statement of account and submitted it to petitioner once a week. If a cash balance remained after all expenses were paid the balance was turned over to petitioner, whereas if Mullin needed additional funds to cover expenses, he would obtain such money from petitioner. During the years in question, Mullin would turn over money to petitioner about 35 or 40 weeks a year and be required to obtain money from petitioner about 10 or 12 weeks a year. During one period in 1958 or 1959, petitioner's numbers business had nine consecutive weeks of losses and on one occasion, when the number 1-2-3-4 was the winning number, petitioner furnished Mullin $22,000 or $23,000 to pay off hits. On the 10 or 12 loss weeks a year, petitioner was sometimes required to give Mullin more than $2,000. On the other hand, there were weeks when Mullin would turn over *174 to petitioner, after all expenses had been paid, amounts ranging up to $7,000, and at least on one occasion, $10,000. In his notice of deficiency, the Commissioner also determined that in addition to petitioner's numbers business, he derived income from a gambling operation known as the "Saturday pea shake," as follows: Low book
$ 1,100 X
(Saturdays in
52
year)
$57,200
Less winning hits (42 per- cent of low book) [1]
24,024
Net profit
$33,176
Less expenses from all gam- bling operations [2]
33,176
Income from Saturday pea shake
Sometime during 1962, petitioner borrowed $10,000 from a Sam Kaplan and about 4 days later he borrowed an additional $5,000 from him, all of which money $10,000 from a Sam Kaplan and about 4 days later he borrowed an additional was repaid in full within approximately 80 days. Petitioner also borrowed money from the American *175 Fletcher National Bank & Trust Co. of Indianapolis, Indiana (hereinafter American Fletcher). For the period October 15, 1959, to December 31, 1962, petitioner's loan balance with American Fletcher varied from $3,500 to $18,500. Petitioner's loan balance with that bank, on selected dates, was as follows: Date
Loan Balance
January 27, 1960
$ 8,100
December 16, 1960
18,000
December 11, 1961
14,000
December 12, 1962
14,000
December 10, 1963
On August 8, 1958, petitioner borrowed $27,500 on a mortgage loan with Anchor Federal Savings & Loan Association (hereinafter Anchor Federal). Although monthly payments, including principal and interest, were $275, petitioner repaid the loan sporadically, frequently missing monthly payments. The loan was paid in full in 64 payments, most of which were double payments in the amount of $550, three were in the amount of $1,100, and one in the amount of $949.18. During the years in question, petitioner made total annual payments on the Anchor Federal loan in the following amounts: Year
Total Payments
1958 [1]
$ 1,952.50
1959
3,475.00
1960
3,852.75
1961
10,773.40
1962
4,950.00
On December 28, 1962, petitioner's loan balance on the Anchor Federal loan was $7,887.41, *176 and by January 20, 1964, the loan was paid in full. All moneys borrowed from Sam Kaplan, American Fletcher, and Anchor Federal were used to pay off gambling debts arising from petitioner's business. Petitioner paid no Federal excise tax on wagering in his own name for any period during the years in question. On August 28, 1962, and May 1, 1963, petitioner was interviewed by an internal revenue employee concerning his nonfiling of Treasury Form 730, relating to tax on wagering. On both occasions petitioner stated that he was not liable for the tax. At the interview on May 1, 1963, he not only denied having any liability for the wagering tax, but he also informed the revenue employee that his gambling business had been sold to Mullin. In January 1963 respondent's special agents were assigned the task of looking into petitioner's tax liability. After a surveillance period af approximately 5 months, search and arrest warrants were obtained and on June 7, 1963, seven of respondent's special agents raided the residence of petitioner as well as other locations which were thought to be connected with petitioner's numbers operation. When the special agents arrived at petitioner's residence, *177 petitioner was asked whether he was in the numbers business, to which he responded in the negative. During the search of petitioner's residence, bet slips relating to his numbers operation for May 24, 27, 28, 29, 31, and June 3, 4, 5, and 6 were found in drawers behind the paneling in petitioner's basement. Subsequent to petitioner's arrest, the special agents obtained from his billfold master tapes of his numbers operation for each of the days June 3, 4, 5, and 6, 1963, each tape showing, on a daily basis, the low book and hits for each pick-up man as well as the total low book and hits for that day. On the basis of the records seized for the days June 3 to 6, 1963, the Commissioner determined that petitioner had annual income from his numbers operation, for each of the 5 years in question, in the amount of $444,367.50. The annual income computation was arrived at by first totaling the low book figures for the 4 days, June 3 to 6, 1963. The total low book figure was then divided by four to arrive at an average daily low book. This low book figure was then subtracted from the average of the total gross daily receipts [8] *179 for the same 4 days. (The difference, which amounted to approximately *178 35 percent of the gross daily receipts represented the average of the writers' commissions for the 4 days.) Next, the average total daily hits, as well as the average daily total of pick-up men's commissions, for the same 4 days, were computed. Then, the 4-day average of the writers' commissions, winning hits, and pick-up men's commissions were added together and their sum was subtracted from 674 the average of the gross daily receipts for the same 4 days to arrive at petitioner's average daily taxable income from gambling. The resultant figure, $1,777.47, was multiplied by 250 [9] to arrive at an annual taxable income from gambling of $444,367.50. A numerical computation is set forth below: 6/3/63
6/4/63
6/5/63
6/6/63
Gross daily
$6,629.08
$4,917.49
$4,920.14
$5,199.51
receipts [1]
Total low book [1]
4,470.92
3,183.55
3,202.05
3,382.36
Difference
$2,158.16
$1,733.94
$1,718.09
$1,817.15
(writer's comm.) [2]
Gross daily
$6,629.08
$4,917.49
$4,920.14
$5,199.51
reecipts [1]
Less: Writer's comm
$2,158.16
$1,733.94
$1,718.09
$1,817.15
Winning hits [1]
844.25
2,510.08
1,875.85
759.70
Pick-up men's comm.
357.67
254.68
256.17
270.59
(8% of low book)
Total
$3,360.08
$4,498.70
$3,850.11
$2,847.44
Taxable income
$3,269.00
$ 418.79
$1,070.03
$2,352.07
New York Stock
X 250
Exchange open 250
days
Total annual
$444,367.50
taxable income from
gambling
N1 The records
N2 The
N8 Gross
N9 Although
seized in a
writer's
daily
the New York
raid by
commission is
receipts
Stock
Internal
the difference
refer to the
Exchange was
Revenue
between the
total dollar
open for more
Service
gross daily
amount bet on
than 250 days
special agents
receipts and
a given day,
during 4 of
on June 7,
the low book.
before any
the 5 years
1963, showed
commissions
in question,
the gross
or other
and for 250
daily
expenses were
days in the
receipts, the
deducted.
remaining
total daily
year, we need
low book, and
not consider
the total of
that fact
the daily
inasmuch as
winning hits.
respondent
has filed no
motion for an
increase in
the
deficiency.
Total for the
Average for the
Four Days
Four Days
Percentage
Gross daily
$21,666.22
$ 5,416.55
100.00
receipts [1]
Total low book [1]
14,238.88
3,559.72
65.72
Difference
$ 7,427.34
$ 1,856.83
34.28
(writer's comm.) [2]
Gross daily
$21,666.22
$ 5,416.55
100.00
reecipts [1]
Less: Writer's comm
$ 7,427.34
$ 1,856.83
34.27
Winning hits [1]
5,989.88
1,497.47
27.65
Pick-up men's comm.
1,139.11
284.78
5.26
(8% of low book)
Total
$14,556.33
$ 3,639.08
67.18
Taxable income
$ 7,109.89
$ 1,777.47
32.82
New York Stock
Exchange open 250
days
Total annual
taxable income from
gambling Records seized by respondent's agents on June 7, 1963, show the low book and winning hits for the following dates in that year: Date
Low Book
Winning Hits
Mon., April 29
$4,823.07
$ 835.30
Tues., April 30
3,313.37
2,045.05
Thurs., May 2
3,813.48
3,870.25
Fri., May 3
4,283.94
1,579.50
Mon., May 20
4,483.93
1,343.75
Tues., May 21
3,378.52
609.20
Wed., May 22
3,182.13
878.90
Fri., May 24
3,734.33
3,067.35
Mon., May 27
4,212.91
2,529.10
Tues., May 28
3,161.85
1,348.20
Wed., May 29
3,261.07
1,304.80
Fri., May 31
3,659.71
1,239.75 The following schedule relating to petitioner's *180 Saturday pea shake operation was prepared from adding machine tapes which were seized by special agents during the raid at petitioner's count house on June 7, 1963: Date
Low Book
Winning Hits
Saturday, May 4
$1,554.50
$ 819.30
Saturday, June 1
1,442.63
1,455.50
On January 24, 1964, petitioner entered a plea of guilty to four counts of willfully attempting to evade the excise tax on wagers for the months of March, April, May, and June 1963; one count of subscribing to a false wagering excise tax return for December 1962; and one count of subscribing to a false special tax return and application for registry-wagering for the fiscal year ended June 30, 1963, under the penalties of perjury. Petitioner was subsequently sentenced on all counts and thereafter served a term in prison. On April 30, 1965, a Federal excise tax on wagering was assessed against petitioner under section 4401 of the Code covering the period July 1, 1956, through June 30, 1963, in the amount of $1,074,024.45, as well as an addition to tax of $537,012.38 under section 6653(b). Petitioner filed no protest to this assessment. In making this assessment against petitioner, the Commissioner determined that petitioner's annual gross *181 receipts from his gambling operations for the years in question were as follows: Year
Annual Receipts
1958
$1,355,148.70
1959
1,365,861.40
1960
$1,355,148.90
1961
1,349,792.60
1962
1,355,098.90
During the years in question, petitioner failed to keep and maintain proper books and records of his gambling operations of a pool or gambling lottery. In attempting to reconstruct petitioner's income from gambling operations for the years in question, respondent relied on the master tapes for the 4-day period June 3 to 6, 1963, to the exclusion of all other records pertaining to petitioner's numbers operation which had been confiscated by respondent's agents at the raid on June 7, 1963. Opinion Issue 1 Understatement of Income The threshold question is whether petitioner realized taxable income from his gambling operations during each of the years in question in excess of the amounts reported on his income tax return, and if so, the amounts thereof. During the years in question, petitioner conducted an illegal gambling operation for which he failed to keep and maintain proper books and records as required by sections 4403 and 6001 of the Code. On his income tax return for each of those years, petitioner *182 reported under "Other Income," what was designated on the return as the excess of income over losses from gambling, in the following amounts: 1958
$ 5,713.31
1959
24,683.13
1960
1,034.06
1961
31,188.59
1962
23,225.13
No further explanation of his gambling income was given in the returns. In January 1963 respondent's special agents were assigned the task of looking into petitioner's tax liability and after a 5-month surveillance period, respondent's agents raided petitioner's home and other places, all of which were thought to be connected with petitioner's gambling operations. As a result of the raid on petitioner's home, the agents seized records of petitioner's numbers operation, consisting of four adding machine master tapes for the period June 3 to 6, 1963, and adding machine tapes and bet slips relating to at least 16 days of operations falling within the period April 29 through June 6, 1963. Also seized were adding machine tapes relating to the pea shake operation, covering at least 2 days, May 4 and June 1, 1963. Using the adding machine master tapes for the 4-day period, June 3 to 6, 1963, as well as the records relating to the Saturday pea shake, respondent computed petitioner's additional *183 taxable income from gambling for each of the years in question as follows: Year
Amount
1958
$438,654.19
1959
417,974.37
1960
442,414.44$61961
411,584.86
1962
413,842.37
Section 446(b) of the Code provides that if the method of accounting used by the taxpayer does not clearly reflect his income, the Secretary of the Treasury shall compute his taxable income under a method which will clearly reflect it. As we stated in Louis Halle, 7 T.C. 245, 249-50 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950): This petitioner, like every other taxpayer, was required by law to file an income tax return for each of the years involved herein and to report thereon, fully and honestly, every item of gross income received by him. Inherent in that requirement was the further requirement that he maintain adequate records of some kind to show to him and to the Commissioner the amount of income received by him in each year and the nature and the basis for any deductions claimed. The Commissioner need not accept, as complete, correct, and accurate, the returns filed or the sworn statement of the taxpayer that his returns completely and correctly disclose his tax liability. The Commissioner *184 has authority to check the returns against the records of the taxpayer and, if no records have been kept or if the records are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. * * * It is now established that where a taxpayer reports only a lump sum amount of wagering income and deliberately keeps no books and records, the Commissioner is not limited to any particular method of reconstructing the taxpayer's income but can resort to the best method available under the circumstances, and the Commissioner in making his determination of a deficiency need not compute the net income of the taxpayer with mathematical exactness. Harold E. Harbin, 40 T.C. 373, 377 (1963). Petitioner, relying on the authority of Helvering v. Taylor, 293 676 U.S. 507 (1935) and Welch v. Commissioner, 297 F. 2d 309 (C.A. 4, 1961), contends that since respondent's determination for the years in question was based on only a 4-day sample of petitioner's gambling operations in a year subsequent to the years in question, and since the figures used by respondent in computing petitioner's income failed to reflect *185 many of petitioner's expenses associated with his gambling operations, the deficiency determination was arbitrary, unreasonable, and excessive and therefore not entitled to the presumption of correctness ordinarily accorded it. The cases relied on by petitioner establish the general rule that where petitioner proves that respondent's determination is based upon assumptions which are not supported by the record, and therefore arbitrary and invalid, the petitioner is relieved of his burden of proving the correct amount of tax owed. In such a situation, we will ascertain the facts from all the available evidence without regard to the presumption of correctness. See e.g., Nat Harrison Associates, Inc., 42 T.C. 601, 617-18 (1964). With regard to petitioner's attack on the method relied upon by respondent in computing his income, based as it was upon the master tapes of only 4 days' operations, it has been held that such a method is not arbitary. Fiorella v. Commissioner, 361 F. 2d 326 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court, and O'n/eill v. United States, 198 F. Supp. 367 (E.D.N.Y. 1961). However, we are convinced from a thorough consideration of the record that respondent's *186 determination was excessive for each year in question and we have therefore attempted to redetermine petitioner's correct taxable income within the latitude permitted by the evidence. In doing so, however, we have relied upon the same general method of computation used by respondent, in the absence of any other method adequately supported by the evidence in this case. The most significant error dollarwise made by respondent in computing petitioner's taxable income from gambling was to assume that because the ratio of winning hits to total bets (hereinafter referred to as the win ratio) for the 4-day period relied upon, June 3 to 6, 1963, was only 27.65 percent, that same percentage must be applied to all years in question. As a statistical proposition, if petitioner was paying a winning better 500 to 1 on a three-way number (when the mathematical odds to win are 1,000 to 1), it would appear, and we have so held in the past, [10] that the win ratio is 50 percent. Although petitioner testified that "hits would be 50%," we are convinced from a thorough reading of the record that the win ratio on a three-way number was never more than 45 percent. [11] *188 However, even if the win ratio was as *187 high as 45 percent on a three-way number, the win ratio on all bets accepted by petitioner must have been less since petitioner also accepted bets on four-way numbers which payed out from 22 percent to 25 percent to win. [12] Thus, if the dollar volume of bets received by petitioner were placed equally on three- and four-way numbers, the win ratio for all bets placed would lie between 33 1/2 percent (using the 22 to 45 percent win ratio) and 35 percent (using the 25 to 45 percent win ratio). Inasmuch as the evidence is silent on the actual allocation of bets between three- and four-way numbers, we must assume that the bets were placed one-half on each type of number. Accordingly, we think petitioner's win ratio, for purposes of recomputing his gambling income during the years in question, should be 34.25 percent, which is the mean point between 33 1/2 percent and 35 percent, instead of the 27.65 percent used by respondent. In computing petitioner's deficiency, respondent allowed him a business expense deduction for his gambling operations in 677 the total amount of $33,176 for each year in question. This amount was intended to include, according *189 to the notice of deficiency, "wages, supplies, car expenses and car depreciation." Absent evidence from which we can say petitioner's expenses for those four items were greater than allowed by respondent, we must sustain respondent's allowance on those items. However, petitioner has proved the existence of an expense for which respondent allowed no credit in his computation, namely, the Federal excise tax on wagering which was paid by Mullin out of funds now ascribed by respondent as gambling income to petitioner during the years in question. Those taxes were clearly an ordinary and necessary expense of petitioner's gambling business [13] and as such must be allowed in recomputing petitioner's gambling income.
In computing petitioner's income, respondent relied on a method which placed overriding importance on four adding machine master tapes obtained from petitioner's billfold at the time of his arrest on June 7, 1963. Those tapes, for each of the days June 3 to 6, 1963, contained the low book and hits itemized as to the 11 pick-up men, as well as the total low book, the total hits, and the *190 difference. From the latter figure, respondent deducted the pick-up men's commissions to arrive at taxable income for each of the four days. The taxable income for all four days was then totaled, the total was divided by the number of days relied on (four) to arrive at the average taxable income per day. The resulting daily average was then multiplied by 250, the minimum number of days in each of the years in question the New York Stock Exchange was open, to arrive at an annual taxable income from petitioner's numbers operation of $444,367.50. We have determined, supra, that in recomputing petitioner's taxable income, a win ratio of 34.25 percent rather than 27.65 percent should be used. However, as to the figures used by respondent for gross daily receipts, low book, writer's commissions, and pick-up men's commissions, we think no changes are necessary. Although the figures for 16 days of petitioner's numbers business have been established, and they indicate average gross daily receipts slightly in excess of the figure derived from the 4-day period relied on by respondent, we think no change is required inasmuch as the 16-day period includes the results for four Mondays, one more *191 than would usually be found in a random sample of 16 days of petitioner's numbers operation. Since the receipts for Monday were, on the average, larger than for any other day, the inclusion of the fourth Monday in the 16-day sample results in a higher average gross daily receipt figure for the 16-day period than would normally be the case. However, the record does contain other evidence from which we might conclude that the average gross daily receipts for the years in question were less than the figure arrived at by using the master tapes for the 4day period June 3 to 6, 1963. For instance, there was testimony that at the time of the raid, more writers were taking bets than during the years in question. There was also testimony that writers and pick-up men were occasionally arrested for their involvement in petitioner's gambling operation with the result that petitioner might have been deprived of the services of those persons for some period of time. However, petitioner has failed to prove that the arrest of any writers or pick-up men actually had that result. Thus, whatever weight might otherwise be accorded the fact that fewer writers participated in petitioner's operations during *192 the years in question than at the time of the raid in 1963 is offset by the fact that during the years in question petitioner employed 11 or 12 pick-up men whereas in June 1963 he employed only 11. To the extent that there is any relationship between the number of employees and total bets placed, the greater number of pick-up men during the years in question would indicate higher, rather than lower, average gross daily receipts. Petitioner contends that since he was required to borrow large sums of money during the years in question, that fact supports the conclusion that his income from gambling must have been accurately reported and that it could not possibly have been of the magnitude which results from the application of respondent's method of computation. Such an argument apparently rests on the supposition that had petitioner's income been as high as respondent's method of computation suggests, he would not have been required to borrow such sums of money. We have found that in 1958 petitioner borrowed $27,500 from Anchor Federal; from 1959 through 1962, 678 petitioner's loan balance at American Fletcher fluctuated between $3,500 and $18,500; and during 1962, petitioner borrowed *193 $15,000 from a Sam Kaplan. Although the foregoing loans were incurred to pay off losses arising from petitioner's gambling business, it does not follow that such borrowings in any way foreclose our conclusion that petitioner failed to report substantial amounts of gambling income. The size of petitioner's gambling operations was sufficiently large so as to literally dwarf the loans in question. In addition, the mere fact that petitioner was required to borrow money from time to time is not inconsistent with our result inasmuch as we specifically recognized that there were days and weeks when petitioner's gambling business lost money. On the other hand, the evidence as strongly indicates that such loss days and weeks were the exception, and that between 35 and 40 weeks a year were profitable, sometimes to the amount of $10,000. We think it significant in the context of petitioner's contention with respect to his loans, that such loans were repaid rather rapidly considering petitioner's reported income for the years in question. Petitioner repaid his $15,000 obligation to Sam Kaplan in approximately 80 days and repaid Anchor Federal $27,500 in 5 1/2 years instead of the scheduled repayment *194 of over 8 1/2 years. From the foregoing, we think the most that can be said regarding petitioner's borrowings during the years in question is that they neither prove nor disprove the deficiency as determined by respondent's method of computation. Accordingly, we think no change is required in the average gross daily receipts when recomputing petitioner's taxable income from his numbers operation. In addition to the taxable income attributable to the numbers operation, respondent determined that petitioner received additional gambling income from the Saturday pea shake in the amount of $33,176 for each year in question. This amount was arrived at by multiplying a low book of $1,100 by 52, the number of Saturdays in the year. From the resulting product of $57,200 was deducted, for each year in question, the amount of $24,024, which was intended to represent the dollar amount of winning hits for each year. The difference, or $33,176, was designated by respondent as the "net profit" before expenses. The record is virtually silent with regard to the pea shake operation except for a stipulation which indicated that adding machine tapes seized by respondent's special agents on June 7, 1963, *195 revealed that on Saturday, May 4, 1963, the low book from the pea shake operation was $1,554.50 with winning hits of $819.30, and on Saturday, June 1, 1963, the low book was $1,442.63 with winning hits of $1,455.50. While we have not been informed of the method by which respondent determined that the average low book for the pea shake operation was $1,100, still that figure carries with it a presumption of correctness and the mere introduction of a stipulation indicating a low book of a greater amount for 2 days of operations is not sufficient to destroy that presumption. Thus, in recomputing petitioner's income from the pea shake, a low book of $1,100 should be used. However, in deducting the amount of $24,024 as the annual hits, it appears that respondent was merely using the same win ratio on the pea shake operation as he had used in computing income from the numbers operation, i.e., approximately 27 percent. [14] *197 Inasmuch as we have already determined that the win ratio on the numbers operation was 34.25 percent rather than the 27.65 percent used by respondent, we think it probable that the win ratio on the pea shake operation was approximately the same percentage. Absent evidence *196 to the contrary, we know of no compelling reason for supposing that petitioner's gambling operations offered different odds on Saturday than on other days of the week. The pea shake win ratio, as derived from the figures for May 4 and June 1, 1963, was almost 50 percent. [15] Inasmuch as that percentage was derived from only 2 days of operations, we need not hold that the win ratio was actually that high. However, it does support our conclusion that the win ratio for the pea shake operation was higher than the 27.30 percent used by respondent. Accordingly, in recomputing 679 petitioner's taxable income from the Saturday pea shake, a win ratio of 34.25 percent rather than 27.30 percent should be used. Application of the foregoing changes, although resulting in a smaller deficiency than determined by respondent, would seem to require our sustaining respondent's deficiency, as modified. Petitioner, however, contends in the alternative that even assuming respondent's method of computation was correct, his determination places petitioner on an accrual basis of accounting and therefore petitioner should be entitled to deduct from the income attributed to his gambling operations, the Federal excise tax on gambling which was assessed against petitioner for each year in question but not paid. [16] This somewhat fanciful argument proceeds upon the premise that petitioner only "received" the amount of gambling income actually reported by him and, therefore, if respondent's method of computation correctly reflects the amount of gambling income attributable to petitioner and petitioner is liable for *198 tax on such greater amount, although not received, it follows that respondent has converted petitioner from a cash basis to an accrual basis taxpayer. If this be so, petitioner argues that respondent must, to be consistent, permit petitioner to deduct from such greater amount of income, the Federal excise tax on gambling assessed against petitioner but never paid. The critical weakness in this argument is that we have determined, supra, that petitioner realized substantially more income from gambling that was reported on his returns and inasmuch as petitioner has not proved the nonreceipt of such income, we conclude that he did receive all such income. Consequently, we reject the idea that petitioner was converted from a cash basis to an accrual basis taxpayer and accordingly he is not entitled to offset the assessed tax on wagering against his income from gambling during any of the years in question. years in question. Issue 2 Additions to Tax The remaining issue involves the question whether some part of the deficiency for each year in question was due to fraud with intent to evade tax within the meaning *199 of section 6653(b) of the 1954 Code. The burden of proof with respect to fraud is upon respondent, sec. 7454(a), I.R.C. 1954, and he must establish by clear and convincing evidence that at least some part of the deficiency for each year in question was due to fraud with intent ot evade tax. Arlette Coat Co., 14 T.C. 751 (1950). In Luerana Pigman, 31 T.C. 356, 370 (1958), we discussed the quantum of proof necessary to find fraud and there stated the following: It should be noted at the outset that our conclusion in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Lmburgia, 22 T.C. 1002 (1954); Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Co. [Dec. 7419], 25 B.T.A. 419 (1932). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some aspects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all *200 the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). Petitioner's course of conduct is well documented in the record. Prior to and during all years in question, petitioner operated an illegal gambling business, which he continually denied, falsely representing that he had sold the business to Mullin. In addition, he failed to register and pay, in his own name, the Federal excise tax on wagering as required by section 4401 of the Code. The amount of wagering tax assessed against him, without protest, exceeded $1 million, excluding additions to tax. On January 24, 1964, petitioner pleaded guilty to four counts of willfully attempting to evade the excise tax on wagers, one count of subscribing to a false wagering excise tax return, and one count of subscribing to a false special tax return and application for registry-wagering under the penalties of perjury. While the course of conduct evidenced by the foregoing facts are not direct evidence of an intent to evade income tax, we think they are entitled to substantial weight especially in a case, like the instant one, where the taxpayer's business was illegal and he intentionally and *201 systematically destroyed his business records. In addition to the above evidence, however, is the fact that for each of the 5 years in question, petitioner, an intelligent man, failed to report substantial amounts of gambling 680 income and it is now established that such an omission of income, even standing alone, is effective evidence of fraudulent intent. Kramer v. Commissioner, 389 F. 2d 236 (C.A. 7, 1968), affirming a Memorandum Opinion of this Court, and Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. See also Holland v. United States,, 348 U.S. 121, 137 (1954), rehearing denied 348 U.S. 932 (1955). While we have concluded, supra, that petitioner's income from gambling was not as great as indicated in respondent's determination of deficiency, still the amount of gambling income received was substantially larger than any amount petitioner reported as gambling income during the years in question. Thus, while petitioner never reported as much as $25,000 income from gambling during any year in question, a recomputation of petitioner's income will result in income attributable to petitioner's gambling operations in excess *202 of $300,000 per year. Considering the enormous disparity between these figures, we are compelled to hold that respondent has successfully carried his burden of proving that at least some part of petitioner's deficiency for each year in question was due to fraud. Accordingly, petitioners are liable under section 6653(b) for additions to tax on the deficiency to be determined under a Rule 50 computation. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Respondent concedes that with respect to the years 1958, 1959, and 1960, unless we hold that petitioners' returns for those years were fraudulent, an assessment of deficiency for those years is barred by the statute of limitations.↩
3. Petitioner concedes that his numbers operation was illegal in Indiana during all years in question.↩
1. Includes self-employment tax. ↩
4. The record is replete with contradictions with respect to the payout flgure on both the three-way and four-way number. With respect to the three-way number, the petition, petitioner's opening statement, and the testimony of one of petitioner's former pick-up men support a payout flgure of only $450 on a $1 bet. On the other hand, the testimony of petitioner, petitioner's office manager Van Wert Mullin, and a count house employee tended to support a payout figure of $500 on a $1 bet. Similarly with respect to the payout on a fourway number, whereas the petition supported the figure of $2,200, and the testimony of one of petitioner's witnesses supported a figure of $2,250, the testimony of another of petitioner's witnesses tended to support a payout figure of $2,500 on a $1 bet.
5. On June 7, 1963, approximately 455 writers were involved in petitioner's numbers operation. This was more writers than were involved in petitioner's numbers business during the years in question. 6. The location of the count house would change every few months to prevent its identification by the police. Three months would be about the longest period in which it would remain in the same location. During the years in question the count house was located in petitioner's basement two or three times.↩
1. During a 9-week period in 1959, Mullin was on commission salary only and due to continuous business losses during that period, he received no salary.↩
7. While the record fails to reflect any dollar amounts expended for bondsmen and fines, petitioner retained the services of an attorney for $200 per month, or $2,400 a year for each of the years in question.↩
1. Forty-two percent of the low book would be 27.30 percent of the gross daily receipts, assuming low book was 65 percent of total bets, as was the case with petitioner's numbers operation. ↩
2. Commissioner intended this expense item to cover "wages, supplies, car expenses, and car depreciation" used in connection with all gambling operations conducted by petitioner.↩
1. Four months.↩
8. Gross daily receipts refer to the total dollar amount bet on a given day, before any commissions or other expenses were deducted.
9. Although the New York Stock Exchange was open for more than 250 days during 4 of the 5 years in question, and for 250 days in the remaining year, we need not consider that fact inasmuch as respondent has filed no notion for an increase in the deficiency.↩
1. The records seized in a raid by Internal Revenue Service special agents on June 7, 1963, showed the gross daily receipts, the total daily low book, and the total of the daily winning hits.↩
2. The writer's commission is the difference between the gross daily receipts and the low book.↩
10. Hackerman v. Commissioner, 229 F. 2d 959↩ (C.A. 6, 1955), affirming a Memorandum Opinion of this Court [Dec. 20,349(M)]. 11. The petition itself only alleged that "in fact and under mathematical computation the percentage of hits to gross 'receipts' will vary from 22% to 45% of gross receipts." Petitioner's counsel stated in his opening remarks that "the odds went as much as from four hundred and fifty [presumably indicating a payment of $450 on a $1 bet for a three-way number] to as high in some instances of [sic] twenty-five hundred to one [presumably on a $1 bet for a four-way number]." In addition, the testimony of one of petitioner's former pick-up men similarly indicated that "The largest single hit, I believe, was $4,500." Since the dollar limit on a three-way bet was $10, if the payment on such a number was 45o to 1, the winning better would receive precisely $4,500. 12. The record contains inconsistencies with regard to the precise amount paid out on a fourway number. Whereas the petition suggests a win ratio of only 22 percent and one of petitioner's witnesses testified to a ratio of 22 1/2 percent, petitioner's opening statement as well as the testimony of another of petitioner's witnesses indicated a ratio of 25 percent.↩
13. Rev. Rul. 54-219, 1954-1 C.B. 51. See also, Commissioner v. Sullivan, 356 U.S. 28↩ (1958).
14. Assuming that the low book in the pea shake operation bore the same relationship to total bets as did the low book in the numbers operation, i.e., 65 percent of the total bets, the total annual bets for the pea shake would be $88,000 a year on a low book of $1,100 a week. Since respondent's deficiency notice indicated annual winning hits to be $24,024, it follows that the win ratio was 24,024/88,000, or 27.30 percent. The win ratio resulting from the numbers operation for the 4 days June 3 to 6, 1963, was 27.65 percent. 15. Assuming that the low book was 65 percent of total bets, since the average low book for those 2 days was $1,498.57, the gross bets would be $2,305, and since the average hit for those 2 days was $1,137.40, the win ratio would be 1,137.40/2,305, or 49.34 percent.↩
16. These, of course, would not include the excise taxes paid as noted supra.↩